## Catherine Bosco, by Angelo Bosco, Appellee, v. Boston Store of Chicago, Appellant.

### Gen. No. 27,675.

1. HIGHWAYS AND STREETS—*contributory negligence of seven-year-old child as jury question.* Contributory negligence of a seven-year-old child in crossing a street in front of a standing street car and into the path of an approaching motor truck is not established as a matter of law by evidence that the child, accompanied by her sister two or three years older, attempted to cross the street on the regular crosswalk, that as they were in front of the car it started and they ran across the track and against the truck, where it appears that the movement of the truck was obscured from their view by the street car as they started across the street and that the truck was a few feet ahead of the car and had started before the car to cross the path which approaching pedestrians would naturally take.

2. HIGHWAYS AND STREETS—*when verdict for young child for personal injuries not against evidence.* A verdict awarding damages for injuries to a seven-year-old child is not against the manifest weight of the evidence where it appears such child, accompanied by a sister two or three years older, attempted to cross the street on the regular crosswalk at intersecting street corners, that a street car had stopped to discharge passengers a few feet before reaching the walk and that the children passed in front of the standing car, that, as they were in front of it, it started and they ran on across the tracks and into the motor truck in question which was approaching from the same direction as the street car but a few feet ahead of it, and that the children's view of its movements was obscured by the street car.

3. HIGHWAYS AND STREETS—*when negligence of truck driver is jury question.* Freedom from negligence of a truck driver is not established as a matter of law in an action for damages for personal injuries to a seven-year-old child who was struck by the

truck in question as she ran from behind a street car while cross-ing the street at a regular crosswalk, by evidence that the street car had stopped to discharge passengers and the child crossed in front of it just as it started forward, that she ran forward to avoid the car and struck the side of the truck, that the truck was not proceeding at a dangerous speed and the street was wet and slip-pery so as to prevent the sudden application of brakes because of the danger of skidding, where the truck and car were proceeding in the same direction, and the child's view of the former was ob-scured by the car and there is evidence that the truck started for-ward before the car across the walk where pedestrians might be expected to cross in front of the car.

4. HIGHWAYS AND STREETS—*when verdict holding truck driver negligent not against weight of evidence.* A verdict awarding dam-ages for personal injuries to a seven-year-old child is not against the weight of the evidence on the issue of negligence of the driver of the truck which caused the injuries, where it is shown that the child started to cross the street ahead of a standing street car at a regular crosswalk, that the truck in question headed the same direction as the street car was on the opposite side of the car from which the child was approaching and was not visible to her, that the truck was a few feet in advance of the car and started forward before the car across the walk where pedestrians might be expected to emerge from in front of the car and that the child ran forward to avoid the starting car and struck the side of the truck.

5. MASTER AND SERVANT—*when relationship not established in action against alleged master for personal injuries.* A department store corporation is not chargeable with the negligence of the driver of a motor truck used to carry merchandise between the store and the warehouse, by evidence that the motor truck which caused plain-tiff's injuries was used exclusively for the carriage of the store's merchandise, that the store's servants loaded and unloaded the truck and were in sole charge of the merchandise, that the truck bore the name of the store and was sometimes stored at night in the store barn, where it is shown the truck was owned by a truck sales company and was being demonstrated to the store company, that all expenses of operation including the driver's wages were paid by the truck company, that the driver was an employee of the truck company and had exclusive control of the operation of the truck except as to the route to be taken and the time of use, and was under the sole and complete control of the truck company, and the negligence was solely that of the driver.

TAYLOR, J., dissenting.

Appeal by defendant from the Superior Court of Cook county; the Hon. OSCAR HEBEL, Judge, presiding. Heard in the Branch Ap-

pellate Court at the March term, 1922. Reversed. Opinion filed
June 20, 1923. Rehearing denied July 3, 1923.

MOSES, ROSENTHAL & KENNEDY, for appellant; HAM-
ILTON MOSES, of counsel.

T. FRED LARAMIE, for appellee.

MR. PRESIDING JUSTICE THOMSON delivered the opin-
ion of the court.

By this appeal the defendant seeks to reverse a
judgment for $9,000, recovered by the plaintiff in the
superior court of Cook county, in a suit brought by
the plaintiff to recover damages for injuries received
when she was run over by a truck alleged to have
been operated at the time by the defendant and in
connection with its business.

This case came before this court on a prior occa-
sion, on appeal from a judgment recovered by the
plaintiff. At that time the judgment was reversed for
error in excluding evidence offered by the defendant
tending to show that the truck was not owned and
operated by the defendant at the time plaintiff re-
ceived her injuries, which issue had been raised by
the pleadings. Following the remandment and re-
docketing of this case, another trial was had, result-
ing in the judgment from which this appeal has been
perfected.

Originally, the Grabowsky Power Wagon Company
was a codefendant in this case with the Boston Store,
but later the wagon company was eliminated from the
case. It appears from the evidence in the record that
one Ginsberg was the president of the wagon com-
pany and that one Hart was the general manager of
the defendant, Boston Store. Some two months prior
to the occurrence in question, an arrangement was
entered into between these two corporations, through
the individuals referred to, whereby the wagon com-

pany placed the name "Boston Store" on the side panels of two automobile trucks, owned by the wagon company, using a lettering such as had theretofore been used, and was then in use, by the Boston Store, in connection with the wagons used by it in its business. Ginsberg desired to demonstrate to the Boston Store the advisability of using motor-driven vehicles.

The Boston Store, up to that time (1911), had used horse-drawn vehicles exclusively in connection with its business. The Automobile Truck Show was about to be held in the City of Chicago, and Ginsberg secured Hart's consent to put the name of the "Boston Store" on the side panels of two trucks belonging to the wagon company, and exhibit them at the truck show, for the advertising such an exhibit would give his company. This was done, and, pursuant to the arrangement entered into between Ginsberg and Hart, after the truck show had been concluded, these two trucks were sent over to the Boston Store for its exclusive use, in connection with its business. From that time up to the time of the occurrence in question, and subsequent thereto, they were so used. One of these trucks was a furniture truck which was used to deliver furniture to customers of the defendant. The other was the truck in question, which was used in going to and from the defendant's main store, at Madison and State streets, in the City of Chicago, and defendant's warehouse at Madison street and 45th avenue. In addition to the name of the defendant, which appeared on the side panels of the truck, it appears that it bore the name "Grabowsky Power Wagon Company" on the running gear of the framework. The evidence shows that for some six weeks or more, prior to the occurrence in question, this truck had been used exclusively in connection with the defendant's business in carrying merchandise between the defendant's store and the warehouse. The person who operated the truck as the chauffeur was

a man named Tubbs, who was in the immediate employ of the wagon company and was paid by that company. During this period of six weeks Tubbs reported each morning, with the truck, at the Boston Store, at the same time the defendant's employees were required to report, and at the close of each day's work he put the truck up for the night, sometimes in the premises of the defendant, Boston Store, and sometimes in those of the wagon company. The wagon company charged the defendant nothing for the use of the truck, took care of such repairs as were required, furnished the oil and gasoline incident to its operation, and, as above stated, paid the wages of Tubbs, the chauffeur. When the defendant began the use of this truck in connection with its business, in the manner already described, it apparently replaced a horse-drawn vehicle which had been used up to that time, and which had been in charge of the defendant's employee, Eisenbeis, who had a helper named Koch. At the time they began to use the truck, Eisenbeis and Koch were assigned to work on it, and the evidence shows that Eisenbeis was in charge of the truck, with Koch as a helper and Tubbs as the chauffeur. As the truck was being operated under this arrangement it was a part of the duties of Tubbs to assist Eisenbeis in becoming familiar with its operation. The loading and unloading of the truck were in charge of Eisenbeis and these operations were accomplished by him with the assistance of Koch, and the evidence shows that there were times when Tubbs volunteered to help in these matters. This truck contained doors or gates made up of heavy wire grating, and the evidence shows that when the loading was completed these doors were closed and locked by Eisenbeis, who was the only employee engaged in the operation of the truck who had a key to this lock. The evidence further shows that as a result of the demonstration in the use of trucks in connection with its business,

the defendant concluded to adopt their use, and, in that connection, made its first purchase of trucks some time after the occurrence in question. In going back and forth between the store and the warehouse Tubbs would proceed on his journeys when directed to do so by Eisenbeis,—that is, whenever the material which was to be carried had been loaded and the truck had been locked and was ready to leave, Eisenbeis would direct Tubbs to go ahead. During the period of six weeks, the evidence shows that there were one or two occasions when the truck was operated by one of the other employees of the wagon company.

At the time the plaintiff received the injuries which are the basis of this suit, brought by her against the defendant, the truck in question was proceeding from the defendant's warehouse to its main store, in an easterly direction along Madison street, on which there is a double track street car line. The plaintiff was a child seven years of age. She was accompanied by her sister, two or three years older. They were apparently returning from school to their home. As they approached the intersection of Paulina and West Madison streets, which intersect at right angles, they were walking east on the north side of Madison street. When they reached the west cross-walk of Paulina street, they turned south, across Madison street, the older girl holding the plaintiff's hand. An eastbound Madison street car, traveling on the south track in Madison street, had come up to the Paulina street intersection and came to a stop a little to the west of the crosswalk over which the plaintiff and her sister were proceeding. As this car stood there for the purpose of taking on and discharging passengers, the automobile truck, being driven by Tubbs and with the defendant's employees, Eisenbeis and Koch on the seat beside him, approached from the west, in the south roadway of Madison street, between the

street car tracks and the curb, and came to a stop a few feet behind the street car. Apparently the movement of passengers to and from the street car was concluded, and, as the car was about to proceed, the truck also proceeded east. The evidence shows that as the plaintiff and her sister were about at the north rail of the eastbound track, the street car started up and the children ran a little to the eastward and hurried on across the street car track, so as to avoid being struck by the car. Just at this moment the truck came along and the evidence shows that at the time the front end of the street car passed over the west crosswalk of Paulina street, the front end of the truck was several feet ahead of the car. The plaintiff and her sister collided with the rear portion of the front fender of the truck and apparently in drawing back they bumped into the street car and then rebounded toward the truck, and, in some manner, the plaintiff was knocked down and run over by the rear wheel of the truck, receiving the injuries complained of.

In support of its appeal the defendant first contends that the evidence shows that the plaintiff was guilty of contributory negligence and, further, that no negligence was shown in connection with the operation of the truck. It is the contention that the trial court should have held these propositions to have been established as a matter of law, but that if this court should not adopt that view, it should be held that the verdict of the jury was against the manifest weight of the evidence on these issues.

As to the contributory negligence of the plaintiff, it is true, as the defendant contends, she was of such an age as to be answerable for the exercise of a proper degree of care and that a failure on her part to exercise such care might defeat her recovery in this case, but in our opinion the evidence is not such as to establish her contributory negligence as a mat-

ter of law, nor is it such that we would be warranted in holding that the verdict of the jury, involving as it does a lack of contributory negligence on her part, is against the manifest weight of the evidence. Our attention has been called to a number of cases involving contributory negligence on the part of children, where it has been held that the evidence established contributory negligence as a matter of law, or where verdicts for the plaintiff have been set aside as against the manifest weight of the evidence, on the issue of the plaintiff's contributory negligence, but in our opinion the facts involved in these cases are not such as to make them applicable to the case at bar. As the plaintiff and her sister proceeded to cross Madison street, the movements of this truck were almost entirely obscured by the street car. In our opinion it is not of great importance that at the time the children collided with the truck they were running. It was not unnatural that when the car made a forward movement, just as the children reached the track on which it was, they should hurry across to get out of its way. There is no doubt from the evidence in the record, as pointed out by the defendant, that the children ran into the truck, but, in our opinion, that is not of great importance under all the circumstances here involved. Quite naturally, the opposite might be the case if the truck were the only vehicle to be considered, and the evidence showed that the plaintiff and her sister deliberately ran across the street, with the truck in full view, and collided with the side of it. But, with the circumstances such as the evidence establishes in this case, we are of the opinion that the question of whether the plaintiff was guilty of contributory negligence, in proceeding across the street as she did, was a question of fact, and, as such, was properly submitted to the jury and that a verdict in her favor may not be disturbed on the ground that it is against the manifest weight of the evidence on that issue.

We take the same view with reference to the issue of negligence in the operation of the truck. It is true, as the defendant contends, that the truck was not proceeding at a dangerous rate of speed, nor do we consider of great importance the question of t e sounding of warning signals. The evidence shov s that at the time in question the pavement was wet and defendant contends that even if the evidence demonstrated that Tubbs saw the children coming into the side of the truck, he could not have put on his brakes and brought the car to a stop before the rear wheel reached them, because that would have caused the truck to skid, with even greater danger to the children than was the case as the truck was operated. Even if it be considered that the truck remained at a standstill, until the movement of passengers to and from the car had been concluded, we are of the opinion that the matter was properly submitted to the jury as a question of fact as to whether Tubbs was negligent in starting ahead and driving his truck past the street car, so as to emerge from behind the car and drive over the crosswalk, ahead of the car, at the point where pedestrians might be expected to pass at any moment, when it was apparent that any such pedestrians who might be approaching from the north side of Madison street in front of the street car would be endangered by such an operation. As to this issue, also, as already stated, we are of the opinion that it may not be said that the verdict and judgment appealed from are against the manifest weight of the evidence.

The defendant makes the further contention that even on the assumption that the plaintiff was in the exercise of due care, for a child of her age, and that Tubbs was guilty of negligence, it may not be held liable for damages by reason of the injuries suffered by the plaintiff, because Tubbs was not a servant of the defendant, and, therefore, there was no such re-

lationship existing between it and the person at fault as would be necessary to establish liability on its part. Such negligence as there was lies at the door of Tubbs, who was operating the truck. Was he, in the operation of this truck at the time in question, acting as a servant of the defendant, in such a legal sense as makes it liable as the employer for the damages caused by such negligence? The fact that the name ''Grabowsky Power Wagon Company'' appeared on the running gear of the framework of the truck, we do not regard of material significance. The name ''Boston Store'' appeared in large and prominent lettering upon the sides of the truck body. This would lead to the presumption that the truck was owned, operated and managed by the defendant. But it is the defendant's contention that this presumption was overcome by the facts shown by the evidence, which were not disputed, and which were to the effect that at the time of the occurrence the truck was owned by the Grabowsky Power Wagon Company; that it was being operated under a State dealer's demonstrating license, issued to that company; that the truck was being driven by Tubbs and that its operation was within his exclusive control at the time plaintiff was injured; that Tubbs was in the employ of the Grabowsky Power Wagon Company and received his pay from that company and not from the defendant and that, at times, the wagon company sent another chauffeur to operate the truck in place of Tubbs; that, pursuant to the instructions of the president of the wagon company, Tubbs operated the truck back and forth between the main store of the defendant and its warehouse for the purpose of demonstrating what it would do and of teaching defendant's employees how to operate it; that the wagon company had the truck covered by insurance, and paid the cost of oil, gasoline and repairs incident to its operation and charged the defendant nothing for

the operation and use of the truck during this period of demonstration; that the merchandise of the defendant, transported by the truck, including the loading and unloading of it, was within the exclusive jurisdiction of defendant's employees and that Tubbs had nothing to do with it, except at times when they were in a hurry and Tubbs volunteered to help in the loading and unloading.

In addition to that which has already been referred to, the material testimony on these matters was to the following effect: Ginsberg, the president of the wagon company, testified that he sought an introduction to Mr. Hart, the defendant's general manager, and had a talk with him, in which he told him he had just embarked in the automobile truck business; "That if he would do me the favor, I would like to have him permit me to demonstrate our trucks for them, not alone to satisfy my mind on what the trucks could do, but what the saving would be for hauling merchandise. * * * And if I could demonstrate to my satisfaction that department stores could use these trucks at a saving, I thought I had a very good business. I also told him I would be glad to demonstrate for him without any cost whatsoever; that we would furnish the trucks to him, furnish the chauffeurs, take care of the trucks," and keep them insured. The witness testified further: "I also told him we would keep the trucks in repair and would keep the record in our office of everything that the trucks could do; it was to my interest to do that, and if he would permit us to send those two trucks over and do their work, it would not cost him a cent,— would not obligate him in any way to purchase the trucks." Ginsberg testified that Hart hesitated about the suggested arrangement and that he talked to him for probably an hour, and "finally I told him it would be a big favor to me if he would consent to do it, and he finally said all right, he would do it."

According to the testimony of this witness, the two trucks which have heretofore been referred to were sent over to the defendant, pursuant to this arrangement, one being driven by Tubbs, the chauffeur who was driving the truck which injured the plaintiff, and the other being driven by one Hassner, both of whom were chauffeurs or demonstrators in the employ of the wagon company. During the period of the demonstration, the repairs incident to the operation of the trucks, as well as the necessary gasoline and oil, were furnished by the wagon company. Ginsberg testified that he told Tubbs to take the truck in question over to the Boston Store, and report to the shipping clerk, "and let nobody touch the mechanism of the car and to drive that car from the Boston Store shipping department to their west side warehouse, using it as a transfer truck and to report every evening what he had done to me personally. * * * I told Tubbs not to handle any merchandise and only to take charge of the truck,—to permit nobody to run the truck but himself. * * * I think I told him he was to show them how to run the truck." This witness also testified that the truck was operated during this period under a vehicle license, which was a dealer's demonstrating license, issued on the application of the wagon company. On cross-examination this witness testified that his instructions to Tubbs were to report at the Boston Store every morning and remain there "as long as the Boston Store wished to carry the goods from its place to the west side, or from the west side to the Boston Store"; that he personally selected the west side on account of the route and the roads; that he instructed Tubbs that the merchandise to be carried was to be handled exclusively by the employees of the Boston Store; that he was to leave the Boston Store for the warehouse, or the warehouse for the store, as directed by the Boston Store; that during the period of the demon-

stration of this truck, in connection with the Boston
Store, Tubbs was relieved once or twice by other
chauffeurs in the employ of the wagon company.

Hart also testified as to his conversation with Gins-
berg substantially as the latter had testified to it, and,
further, that Tubbs was not an employee of the de-
fendant, and at no time did the defendant pay him
for services performed. This witness further testi-
fied that the arrangement with Ginsberg was to the
effect that the latter "was to furnish the chauffeur,
gas, and oil"; that the defendant was to put his own
men on the truck in question to handle the merchan-
dise; that "Ginsberg said he would furnish a man to
drive the wagon but that this man was not to handle
the merchandise"; that the man who had previously
been driving one of the defendant's transfer wagons
was assigned to the truck and placed in charge of it,
and the man who had charge of the load had the keys
to the lock which was used to fasten the wire door or
gates used to secure the load on the truck.

Tubbs testified that at the time of the occurrence
in question he was working for the wagon company as
a demonstrator,—"to show the working of the trucks,
and show what they could do"; that Ginsberg was his
immediate superior from whom he received his in-
structions with reference to running trucks for the
wagon company for demonstrating purposes. He
further testified that when the wagon company began
this demonstration in connection with these trucks,
at the Boston Store, he received his instructions from
Ginsberg; that the wagon company paid him for his
work; that in going back and forth between the Bos-
ton Store and its warehouse he was accompanied by
Eisenbeis, and that Eisenbeis had nothing to do with
the operation of the truck, but that his instructions
were to demonstrate the truck; not to let it go out
without him and to teach Eisenbeis how to run it.
Tubbs testified further that while he was demonstrat-

ing the truck, "I was pulled on and off  *  *  *  that is to say that when Grabowsky (Ginsberg) wanted me, he would pull me off from this job and I would go somewhere else.  *  *  *  Sometimes they sent Charles Hassner to take my place." He further testified that during the period of demonstration involving these two trucks, to which reference has been made, they never loaded anything on them except for the defendant; that he started on his trips back and forth between the store and the warehouse, pursuant to the direction of Eisenbeis, and that at times the route was changed slightly at the suggestion of Eisenbeis; that the truck was stored (apparently for the night) at the defendant's warehouse some of the time and part òf the time at the place of business of the wagon company. At another point in his testimony he said he did not operate any other truck during the period of this demonstration except the one running between the defendant's store and its warehouse.

Eisenbeis testified that Charles Hassner was in charge of the truck involved in this case, when it first came over to the defendant's store; that the wagon company had two or three men who afterward drove these trucks; that he did not remember who the second man was; that Tubbs was the one who was driving the truck at the time of the occurrence in question. He further testified that he (Eisenbeis) was responsible for the goods on the truck and that Tubbs had nothing to do with the merchandise or with the loading or unloading, but that Tubbs was in charge of the operation of the truck; that he had been instructed, to some extent, in its operation, and had driven it "once in a while"; that at the time of the occurrence involved in this case he had nothing to do with the operation of the truck; that at times he had gone down to the place of business of the wagon company with Tubbs when he went down there to get gasoline and oil. This witness was interrogated as

to just what occurred at the time the truck proceeded past the street car and injured the plaintiff, and in this connection he testified that he said nothing to Tubbs about going ahead, after they had stopped behind the street car,—"I didn't say anything to him, not a word."

The question to be determined on this evidence is, whose servant was Tubbs when he was guilty of the negligence resulting in the injuries to the plaintiff? In our opinion, the evidence established the fact that he was not the servant of the defendant but rather of the wagon company. The arrangement whereby this truck was being demonstrated had been entered into at the suggestion of the wagon company and that company had agreed to furnish the chauffeurs, to operate both the truck involved here and the other one, which was being demonstrated, and, in carrying out that arrangement, the wagon company had supplied the chauffeur Tubbs, who was regularly in its employ as a demonstrator. While the evidence shows that in operating this truck Tubbs followed the directions of Eisenbeis in such details as involved the time of leaving the main store for the warehouse or the warehouse for the store, it shows that there was no authoritative direction or control over Tubbs, or over the operation of the truck, by the defendant. Although the truck was used in conveying the defendant's merchandise to and from its warehouse, this was done as an incident to the demonstration of the truck for such purposes by the wagon company; and, at the direction of the wagon company, the demonstration was being made by its employee, Tubbs, pursuant to explicit instructions and directions of Ginsberg, the president of the wagon company, as to just what he was to do in making this demonstration and how he was to do it.

To render the defendant liable in this action, the actual control and dominion over Tubbs must have been surrendered by the wagon company, and as-

sumed by the defendant, but this the evidence fails to establish. It shows, rather, that Tubbs was selected and employed by the wagon company; that, as such employee, he was directed by the wagon company to demonstrate this truck by transporting merchandise between the store of the defendant and its warehouse; that he was given explicit instructions by the president of the wagon company as to his operation of the truck; that he continued to receive his pay from the wagon company, and that the wagon company substituted another of its demonstrators or chauffeurs for Tubbs, on occasions, without conferring with the defendant. It is apparent from the evidence, in our opinion, that the wagon company had the sole and complete power to continue the services of Tubbs or to discharge him as it wished, and that the defendant, should it become dissatisfied with Tubbs for any reason, would not have had the power to discharge him, but could only have complained to the wagon company, his employer, and requested the assignment of another chauffeur, if it cared to have the demonstration continue.

It was pointed out by the Supreme Court in *Bristol & Gale Co. v. Industrial Commission,* 292 Ill. 16, that it has been held in this State, and in line with the weight of authority, that the right to control the manner of doing the work is the principal consideration which determines whether the worker is an employee. In some decisions it has been stated that he is the master, and, as such, is liable for damages caused by the servant's negligent acts, who has the right to choose the servant and to direct and control his work. It has further been held that the right to control involves the right to discharge and that the relation may not be held to involve the right to control unless the right to discharge is shown to have been present. The latter, however, may not hold true in some situations as, for example, where an employer loans his

servant to another for the doing of certain work for the latter, under circumstances giving the latter complete control over the servant, although he remains on the employer's pay roll. The United States Supreme Court has said in the case of *Standard Oil Co. v. Anderson*, 212 U. S. 215: "In many of the cases the power of substitution or discharge, the payment of wages and other circumstances bearing upon the relation are dwelt upon. They, however, are not the ultimate facts, but only those more or less useful in determining whose is the work and whose is the power to control." In that case it was insisted by the defendant that the servant, whose negligence caused the injuries, complained of by the plaintiff, though in its general employ, had ceased to be its servant, and had become, for the time being, the servant of another. "This may be true," the court said, "although the winchman (servant) was selected and employed, paid and could be discharged by the defendant." The court then proceeded to hold that under the evidence there presented, the facts were not such as to show the winchman to have been the servant of another at the time the injuries were inflicted, but that he remained the servant of the defendant and that the defendant was liable for the damages caused by the servant's negligence.

In deciding the question, "Whose servant was the winchman when he was guilty of the negligence which caused the injury," the court observed that it would "aid somewhat in the ascertainment of the true test for determining this question to consider the reason and extent of the rule of a master's responsibility." The court then went on to say that "the master is answerable for the wrongs of his servants, not because he has authorized them, nor because the servant, in his negligent conduct, represents the master, but because he is conducting the master's affairs, and the master is bound to see that his affairs are so con-

ducted that others are not injured.'' Further, the
court pointed out that where one wished for certain
work to be done for his benefit and did not have the
persons in his employ who could do it and was unwill-
ing to take such persons into his general service, he
might enter into such an agreement with another as
would involve that other furnishing him with men to
do the work and placing them under his exclusive
control in the performance of it, and in that event
those men would become *pro hac vice* the servants
of him to whom they were furnished. But, on the
other hand, one might prefer to enter into an agree-
ment with another, whereby the latter would himself
perform the work through servants of his own selec-
tion, he retaining the direction and control of them.
''In the first case,'' the court said, ''he to whom the
workmen are furnished is responsible for their neg-
ligence in the conduct of the work, because the work
is his work, and they are for the time his workmen.
In the second case, he who agrees to furnish the com-
pleted work through servants over whom he retains
control is responsible for their negligence in the con-
duct of it, because, though it is done for the ultimate
benefit of the other, it is still, in its doing, his own
work. To determine whether a given case falls within
the one class or the other, we must inquire whose is
the work being performed,—a question which is usu-
ally answered by ascertaining who has the power to
control and direct the servants in the performance
of their work. Here we must carefully distinguish
between authoritative direction and control and mere
suggestion as to details or the necessary co-operation,
where the work furnished is a part of a larger under-
taking.''

In the case cited, one Torrence, a stevedore, under
contract with the defendant, was engaged in loading
a ship with oil. The plaintiff, an employee of Tor-
rence, was working in the hold of the ship, which was

alongside one of defendant's docks, to be loaded. He was struck and injured by the unexpected lowering of some cases of oil. The lowering was accomplished by means of certain ropes and tackle, controlled by a winch and drum, owned by the defendant and located on its dock some fifty feet distant from the ship's hatch. All the work of loading was done by employees of Torrence, except the operation of the winch, which was done by a winchman in the general employ of the defendant. The unexpected lowering of the cases, resulting in the injuries complained of by the plaintiff, was occasioned by the negligence of the winchman. The winchman operated his winch according to whistle signals given by an employee of Torrence stationed at the hatch. Upon the occasion in question, he negligently failed to properly observe those signals.

Applying the general principles, to which we have alluded above, to those facts, the court held that at the time the winchman negligently failed to observe the signals of the man stationed at the hatch he was engaged in the work of the defendant and under its rightful control. In this connection, the court observed: "The winchman was, undoubtedly, in the general employ of the defendant, who selected him, paid his wages and had the right to discharge him for incompetency, misconduct or any other reason. * * * For reasons satisfactory to it, the defendant preferred to do the work of hoisting, itself. * * * The power, the winch, the drum and the winchman, were its own. It did not furnish them but furnished the work they did to the stevedore." The court held that the giving of the signals by the man stationed at the hatch, an employee of Torrence, under the circumstances shown, "was not the giving of orders, but of information and the obedience to those signals showed co-operation rather than subordination, and is not enough to show that there has been a change of masters."

And so in the case at bar, the giving of directions by Eisenbeis as to when to start the truck, and so on, showed merely co-operation between the servant of the wagon company, Tubbs, and the servants of the defendant in the demonstration of this truck and cannot be said to indicate that Tubbs had become the servant of the Boston Store. For reasons satisfactory to the wagon company and to the Boston Store, it was arranged that in the demonstration of this truck the actual operation of it was to be under the control of the wagon company and was to be in charge of a chauffeur or demonstrator in its general employ, a man whom it had chosen, whose wages it paid and whom it had the right to discharge if it saw fit. It seems too clear for reasonable controversy that, in operating the truck during this period of demonstration, Tubbs was doing the work of the wagon company, and was not under the control of the Boston Store. In driving the truck he was conducting the affairs of the wagon company, which alone retained the right to control and direct him, and which actually did control and direct him in the doing of that work.

In the case of *McNamara v. Leipzig*, 227 N. Y. 291, where a question similar to the one here involved was presented, the court said: "The liability of the defendant depends on the doctrine of the liability of a master for the acts of his servant done in the course of his employment. * * * A servant may, with his consent, through the agreement of his master, become for the occasion and time and to the extent agreed upon the servant of another. A master may loan or let to another a servant in his general employment, with the consent of the servant, as he may his implements, in such manner that the servant does the work of the other under the other's exclusive control, and, therefore, is for the occasion and time the servant of the other. On the other hand, the master

may agree with another that the master shall himself perform the work of the other through his own servant, the master retaining the service, direction and control of the servant. To determine whether a given case falls within the one class or the other we must inquire whose is the work being performed.'' When we apply the inquiry suggested in the case cited to the situation in the case at bar, the status of Tubbs is made clear. The work which Tubbs was doing in connection with which he was negligent, resulting in the injuries complained of, was the operation of the truck. Whose work was that? In other words, for whose benefit was the truck being run? Obviously, for the benefit of the wagon company who wanted to demonstrate the truck. The fact that in making this demonstration the truck was running back and forth between the defendant's store and its warehouse was one which was purely incidental to the demonstration. In other words, Tubbs was driving this truck, on the occasion in question, as a part of its demonstration for the benefit of the wagon company, and not primarily for the purpose of taking some merchandise from the defendant's warehouse to its store or for the purpose of going to the store' for a load of goods. The primary purpose of running the truck was to demonstrate it, and not to carry the defendant's merchandise.

A case involving practically the very same situation presented by the facts in the case at bar is the case of *McGuire v. Auto Car Sales Co.*, 134 N. Y. Supp. 702. There the defendant was in the business of selling automobile trucks, and in that connection it kept chauffeurs who operated the trucks for the purpose of demonstrating their effectiveness to intending purchasers. Negotiations were pending between the defendant and a large dry goods concern known as Greenhut & Company, involving the possible purchase of some trucks. Greenhut & Company had not become convinced of the effectiveness of the trucks in

some particulars and the defendant offered to furnish one of its trucks to demonstrate that it was effective. Pursuant to this arrangement, the defendant sent one of its trucks to Greenhut & Company's store where it was loaded with boxes of some merchandise belonging to Greenhut & Company. One of the employees of the latter went along with the truck and gave directions as to where it should be driven, but the actual operation of the truck was at all times under the personal control of a chauffeur, who was in the general employment of the defendant company. In the course of the operation of the truck, in this manner, it struck the plaintiff and injured him. In that case there was a dismissal as to Greenhut & Company at the close of the case and the question of the liability of the Auto Sales Company was left to the jury and a verdict was returned in the plaintiff's favor. In affirming the judgment so recovered by the plaintiff, the court commented on the contention of the Auto Sales Company to the effect that by reason of its arrangement with Greenhut & Company it had transferred the truck and the services of the chauffeur to the possession and use of Greenhut & Company and that thus the chauffeur had become the servant of Greenhut & Company and could no longer be considered the servant of the Auto Sales Company and then observed that while, in one sense, the chauffeur was doing the work for Greenhut & Company, "yet the doing of this work was but incidental to a larger work which he was doing for the defendant (Auto Sales Company) and which was the main purpose of his operating the machine, that is to say, he was demonstrating by actual experience, on behalf of the defendant, the effectiveness of its auto truck, for the purpose of inducing, for the benefit of his general employer, the purchase either of that truck or other trucks by Greenhut & Company."

Other decisions to the same general effect, in different jurisdictions, are to be found in *Quarman v.*

*Burnett*, 6 M. & W. 499; *Little v. Hackett*, 116 U. S. 366; *Kellogg v. Church Charity Foundation*, 203 N. Y. 191 [3 N. C. C. A. 444]; *Hanatsek v. Wilson*, 161 N. Y. App. Div. 634, 146 N. Y. Supp. 1016; *Weaver v. Jackson*, 153 N. Y. App. Div. 661, 138 N. Y. Supp. 609; *Spellacy v. Hagerty Motor Trucking Co.*, 182 N. Y. Supp. 355; *Vasligato v. Yellow Pine Co.*, 158 N. Y. App. Div. 551, 143 N. Y. Supp. 817; *Miranker v. Williams*, 94 N. Y. Misc. 632, 158 N. Y. Supp. 273; *Baker v. Allen & A. Auto Renting Co.*, 231 N. Y. 8; *Wooding v. Thon*, 148 N. Y. App. Div. 21, 132 N. Y. Supp. 50; *Ouellette v. Superior Motor & Machine Works*, 157 Wis. 531 [6 N. C. C. A. 357], 147 N. W. 1014; *Gerretson v. Rambler Garage Co.*, 149 Wis. 528, 136 N. W. 186; *Peach v. Bruno*, 224 Mass. 447, 113 N. E. 279; *Wilbur v. Forgione & Romano Co.*, 109 Me. 521, 85 Atl. 48; *Foster v. Wadsworth-Howland Co.*, 168 Ill. 514.

While it is a matter apart from the issues involved in this case, we have noted from reference made in the record that the wagon company went into bankruptcy some time after the occurrence involved here, which may furnish the reason for the action of the plaintiff in dismissing this suit as to that company and proceeding as against the Boston Store.

We feel obligated to hold that under all the evidence in this case the trial court erred in refusing to hold, as a matter of law, that the chauffeur, Tubbs, was not the servant of the defendant and that the defendant could not be held responsible for damages caused by his negligence. The defendant's motion for a peremptory instruction, directing the jury to find the issues in its favor, at the close of all the evidence, should have been allowed.

For the reasons stated the judgment of the superior court is reversed.

*Reversed.*

O'CONNOR, J., concurs.
TAYLOR, J., dissents.