KATHLEEN SCHWEDLER, Adm'r of the Estate of Joseph P. Scialabba, Deceased, Plaintiff-Appellee, *v.* RONALD J. GALVAN *et al.*, Defendants.—(JOSEPHINE GROVE, d/b/a Josephine's Lounge, *et al.*, Defendants-Appellants.)

First District (4th Division)   No. 62629

Opinion filed February 24, 1977.

632

Heineke & Schrader, of Chicago, for appellants.

E. T. Cunningham, of Chicago, for appellee.

Mr. JUSTICE ROMITI delivered the opinion of the court:

The defendants appeal from a jury verdict finding them liable in a dramshop action, contending (1) that the evidence was insufficient to go to the jury, (2) that because of certain evidence improperly admitted, and (3) because of improper remarks by plaintiff's counsel in opening

statements and closing arguments creating evidence which did not exist, the defendants were denied a fair trial.

While we find there was sufficient evidence to go to the jury, we agree that because of certain errors in admitting evidence and improper remarks in argument, the judgment must be reversed and the case remanded for a new trial.

This action was originally brought by Joseph P. Scialabba against Ronald J. Galvan and Hector Coronado for wanton and wilful assault, and against the defendants Grove and Southpark Mortgage Corporation for recovery under the Dram Shop Act. Scialabba was shot and wounded on October 4, 1970, shortly after 2 a.m. at the corner of 29th Street and South Wentworth Avenue in Chicago. Sometime after the suit was filed Scialabba died from causes not related to the shooting. The administratrix was substituted as the plaintiff. At the trial, Galvan and Coronado were declared to be in default for their failure to appear and defend or otherwise answer the plaintiff's complaint; however, no judgment has ever been taken against them.

After evidence presented by the plaintiff (the defendants presented no evidence) the jury returned a verdict for the plaintiff against the defendants for $15,000.

Besides the administratrix, who testified as to her father's health before and after the shooting, and Dr. McCarthy who treated the deceased after the shooting and who testified as to the nature and permanent effects of the injuries and the reasonableness of his and the hospital's bill, three witnesses testified for the plaintiff. The first of these witnesses was John Kennedy, a patrolman assigned to the case after 8:30 a.m. October 4, 1970. He was allowed to testify over the defendants' objection that Galvan had told him that he and Coronado had been in Josephine's Lounge; that they had left and when they came to a man, Coronado took out a gun and fired it at the man; that Galvan said he hadn't known what was going to happen and he was surprised at it, and that there was no exchange of words. The court did instruct the jury that the evidence as to Galvan's statement was admissible only as to him, and as to him, the court was passing on both the law and the facts.

The second of these witnesses was James Price, who testified substantially as follows: He lived on South Wentworth. At about 2 a.m., October 4, he and a friend of his, Freddie Williams, left a tavern known as Father's Lounge located at 2914 South Wentworth where they had been for several hours. They walked south in the direction of Josephine's Lounge which, according to Price, was the only lounge open at that hour in that block. In about the middle of the block, they were approached by two "Mexicans" who appeared to be drunk. One of the two had a gun. He

threatened Williams, saying, "Do you want to die?" Price persuaded them to leave them alone. The two "Mexicans" then continued on their way. Williams and Price stood and chatted and watched the two men. Joseph Scialabba then came around the corner. They heard a shot and Price saw Scialabba fall. While Price did not actually see the shooting, he believed the two men who threatened Williams shot Scialabba. They, Price and Williams, were the only people on the street as Price and Williams walked from Father's to Josephine's.

Price had been in Josephine's Lounge earlier that evening from about 8 p.m. for over an hour. While there, he did not see the two "Mexicans" he later encountered on the street.

The last of these witnesses was John Brown, a bartender at Josephine's Lounge. He testified that on the night of the shooting he worked as the only bartender from 6 p.m. until closing at 2 a.m. Early on the morning of October 4, 1970, three Spanish-speaking men entered the tavern. Brown believed he served each of the men six or eight 12-ounce bottles of beer. One of the men had a gun. Brown told Charles Grove (the owner's husband) that "this dude was drunk and he has a pistol * * *." Grove then took the gun away from the one man. Brown continued to serve the three.

Where the tavern closes at 2 a.m., everyone must leave unless they have a drink on the bar. The three Spanish-speaking men remained for a "short time" after closing but because they became rowdy Grove asked them to leave. Grove also returned the gun to the man from whom he had earlier taken it. All three were drunk when they left, Brown left about five minutes after they did.[1]

Brown knew one of the three men by the name of "Fox." He did not know the other two. He "believed" Price had been in Josephine's at the same time the trio were there.[2]

Brown was shown some photographs the next day. Over objections he testified that he recognized some of the photographs as those of the men who were in the bar the night before. The photographs were not identified.

As already stated, the defendants moved for a directed verdict at the end of the plaintiff's case and did not put on any evidence. They also moved for a mistrial because in his opening statement, plaintiff's counsel said that:

> "(1) the three men, when leaving the tavern threatened a man, William Butler, who was standing outside. He persuaded the man with the gun to take it easy;

---

[1] It may be noted that Price said when he went to Josephine's to telephone the police he saw Grove and Butler; he did not indicate he saw Brown there.

[2] This statement was, however, clearly contradicted by Price's statement that he was only there between 8 and 9 p.m.

(2) Grove told the police that one of the men they were looking for was Galvan and he believed they called the other man Hector and that Grove also told the police the make of the car Galvan was driving."

During the trial, the court ruled that the patrolman John Kennedy could not recount the conversation with Grove since that was hearsay, although Grove had introduced himself to the patrolman as owner of the lounge. Likewise, the plaintiff was unable to locate Butler.

During the closing argument plaintiff's attorney made several serious misstatements as to the testimony of the witnesses. Specifically he argued that after the identification of photographs, the police searched for Galvan; that the police showed photographs to the bartender and to Grove who were able to select them, and that photos were shown to Price. No specific objection to these arguments were made by defense counsel.

## I.

We may quickly dismiss the defendants' contention that the evidence was insufficient for the jury because the plaintiff failed to prove that Galvan and Coronado were the individuals involved in the shooting. The plaintiff did allege that Scialabba was shot by Galvan and Coronado. It is true that normally the allegations and proofs must correspond. But, an objection that the issue was not raised in the pleadings may be waived by the conduct of the objecting party. (*Hemingway v. Skinner Engineering Co.* (1969), 117 Ill. App. 2d 452, 254 N.E.2d 133.) Furthermore, an objection that there was a variance between the pleadings and proof cannot be raised for the first time after verdict and judgment (*Raimondi v. Ziffrin Truck Lines* (1946), 329 Ill. App. 650, 770 N.E.2d 221 (abstract)), since the other party might be able to amend the pleadings. For the same reason, the objection should point out plainly, distinctly and specifically in what the alleged variance consists. 2 Ill. L. & Prac. *Appeal and Error* §249 (1953).

■■ Here the defendants argued at length in chambers that the plaintiff had failed to prove a cause of action. Yet at no time did the defendants suggest that the plaintiff must prove that Galvan and Coronado had been involved and that she had not done so. To the contrary, the defendants in enumerating what the plaintiff must prove stated merely that she must prove that the person inflicting the injury was intoxicated and was sold or given alcoholic beverages by the tavern, and argued that there was no proof that the person who shot the deceased had been in the tavern. Likewise, the defendants did not disagree with the plaintiff's statement that she must prove that there were one or more persons who became intoxicated in Josephine's and who while so

intoxicated shot the deceased. Having failed to raise the issue of variance timely below, the defendants cannot do so here. Accordingly, we need not decide whether the alleged variance was material and misled the defendants to their injury. *De Anguera v. Arreguin* (1968), 92 Ill. App. 2d 381, 234 N.E.2d 808; *Stevenson v. Meyer* (1957), 10 Ill. 2d 335, 139 N.E.2d 740.

■■ The question whether the defendants should have been granted a directed verdict is much more difficult. It is well established that the facts in a dram shop case may be established by circumstantial evidence. (*Hocker v. O'Klock* (1959), 16 Ill. 2d 414, 158 N.E.2d 7.) Moreover, in determining whether the circumstantial evidence establishes that the individuals in Josephine's were the ones who did the shooting, we do not require proof beyond a reasonable doubt, as in a criminal case; we require only, as in other civil cases, that the evidence and inferences therefrom, when viewed in the aspect most favorable to the plaintiff, make it more probable that they did (*Hocker v. O'Klock* (1959), 16 Ill. 2d 414, 158 N.E.2d 7), and a verdict may be directed only in a case in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand. *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504.

In this case there was evidence that three Spanish-speaking men were in Josephine's from midnight until after closing on the night in question. All three were served several beers and were drunk. One of them had a gun. The three remained for a little while after closing, at 2 a.m., but were told to leave because they became rowdy. The gun was returned to the one man before he left. At or approximately at the same time these three left, Price and Williams were walking down the street towards Josephine's. They were accosted by two Spanish-speaking drunks who threatened to kill Williams. There was no one else on the street at that time nor were there any other bars open. After the two Spanish-speaking men continued on their way, Price and Williams stood chatting and watched them. While Price did not actually see the shooting, he believed that Scialabba was shot by the same two men.

The defendants argue that if we are to find for the plaintiff we must infer, first, that in leaving the tavern the three men split up; second, that based on that inference, two of the three walked north along Wentworth Avenue and threatened Price and Williams; and third, based on these inferences, it must then be inferred that the same two men later shot the deceased. The defendants argue that this cannot be done as you cannot base a presumption on a presumption. *Globe Accident Insurance Co. v. Gerisch* (1896), 163 Ill. 625, 45 N.E. 563.

While we do not agree with the defendants' contention that the

inference that the two men in the tavern shot the deceased is based on other presumption and inference rather than on the testimony of witnesses (compare *Hocker v. O'Klock* (1959), 16 Ill. 2d 414, 158 N.E.2d 7), we also do not agree with the defendants' contention that an inference may never be based on an inference. We adopt the reasoning of the court in *Grand Trunk Western R.R. Co. v. M. S. Kaplan Co.* (1963), 43 Ill. App. 2d 230, 242-43, 193 N.E.2d 456, 462-63, which stated:

> "Defendants urge that plaintiff's case must fail because it bases 'an inference upon an inference.' They cite several decisions of our Supreme Court, together with a listing of twenty-one Appellate Court decisions, which have employed this formula in rejecting sequential inferences found to be untenable. Such a sweeping exclusionary formula is of doubtful analytical value in the decisional process. It serves only as a convenient repository for rejected inferences. As stated in 1 Wigmore, Evidence § 41 (3d ed 1940, pp 435-436):
>
> > 'There is no such orthodox rule [against basing an inference upon an inference]; nor can be. If there were, hardly a single trial could be adequately prosecuted. * * * The judicial utterances that sanction the fallacious and impracticable limitation, originally put forward without authority, must be taken as valid only for the particular evidentiary facts therein ruled upon.' (Footnotes omitted.)
>
> In *Plodzien v. Segool*, 314 Ill. App. 40, 43-45 40 N.E.2d 783 (1942), the court relied on the quotation from Wigmore above set forth, in rejecting the theory that an inference cannot be based upon an inference. The court also quoted with approval the sensible position taken in *Sturm v. Employers' Liability Assur. Corp. Ltd.*, 212 Ill. App. 354, 363 (1918), where the court said that 'an inference from an inference, and then a third and fourth may, under certain circumstances, be admissible (*Ohio Bldg. Safety Vault Co. v. Industrial Board*, 277 Ill. 96, 115 N.E. 149 [14 NCCA 224]), but the more remote the inference the more enfeebled its probative force.' We adopt the position taken in these authorities; the pertinent consideration is whether the inference based on an inference is reasonable."

The defendants also contend that it may not be inferred that the three Spanish-speaking patrons of the lounge were connected with the shooting since it can be equally inferred that they were not, citing *Condon v. Schoenfeld* (1905), 214 Ill. 226 at 230, 73 N.E. 333. But as stated in *Olsen v. Pigott* (1963), 39 Ill. App. 2d 191, 196-97, 188 N.E.2d 361, 363-64:

> "Defendants would require that circumstantial evidence, in the absence of direct evidence to establish a fact, not only creates an

inference as to the fact sought to be shown, but also excludes all other inferences. This has never been required. Courts have held that the name of a mercantile establishment on the side of a truck leads to the presumption that the truck was owned, operated and managed by such establishment. *Bosco v. Boston Store of Chicago*, 229 Ill. App. 564. Yet it is obvious that a name on the side of a truck does not exclude the possibility that the truck was not owned, operated and managed by the person or organization named on the side of the truck.

Similarly, proof of ownership of a vehicle has been held to be proof of a circumstance to show prima facie that the owner was the operator of the vehicle at the time of a collision. Again, this may be rebutted, but it is a sufficient showing, absent other evidence. *Howard v. Amerson*, 236 Ill. App. 587.

In *Jacobs v. Illinois Nat. Bank and Trust Co.*, 345 Ill. App. 30, 102 N.E.2d 182, one issue was whether Yardley was driving the car involved in a crash. This court said, 'A greater or less probability, leading on the whole to a satisfactory conclusion, is all that is required to establish controverted facts by circumstantial evidence. (*Ohio Bldg. Safety Vault Co. v. Industrial Board*, 277 Ill. 96, 102, 103, 115 N.E. 149; *Lindroth v. Walgreen Co.*, 407 Ill. 121, 135, 94 N.E.2d 847.) The Lindroth case quotes from *Lavender v. Kurn*, 327 U. S. 645, 90 L. Ed. 916, 66 S. Ct. 740, as follows, viz: "Whenever facts are in dispute or the evidence is such that fair minded men may draw different inferences, a measure of speculation and conjecture is required on the part of those whose duty it is to settle the dispute by choosing what seems to them to be the most reasonable inference. Only when there is a complete absence of probative facts to support the conclusion reached does a reversible error appear." ' "

"Courts have always considered it within the province of the jury * * * to make reasonable inferences from established facts, and such permissible inferences will not be discarded by a reviewing court because other inferences might have been drawn from such established facts, unless the inferences drawn are unreasonable." *Zahn v. Muscarello* (1948), 336 Ill. App. 188, 194, 83 N.E.2d 504, 507, *appeal denied*, 402 Ill. 633; *Hocker v. O'Klock* (1959), 16 Ill. 2d 414, 421, 158 N.E.2d 7, 10.

In *Hocker*, the evidence merely showed that the deceased, Hocker, entered the defendant's tavern at 1 p.m. on a Saturday and remained there all afternoon. Around 2 a man calling himself Nichols (later identified as Beasley) entered the tavern. By 7 p.m. he and Hocker had become drinking companions. They left in an intoxicated condition and drove off in Beasley's car. They entered another tavern. However, when that tavern refused to serve the two any more liquor because they were so

intoxicated, they left. This was between 8 and 9 p.m. That was the last time they were seen together. At 1:16 a.m. that Sunday Beasley was found asleep in his car by police officers. They wakened him but left after a routine and cursory search of the car which did not include the glove compartment. Beasley did not appeared frightened when awakened by the police officers. Hocker's body was found at 3:45 a.m. in a ditch on the right side of a road. He had been shot twice with a .38 caliber gun. There were Firestone tire marks on the shoulder of the road close to the edge of the ditch and near the body. No plaster casts of the marks were made. The coroner estimated that he had been dead between four and five hours; the pathologist who performed the autopsy at 5 a.m. estimated that Hocker had been dead from two to five or six hours. About three weeks later Beasley was arrested after an unloaded .38 caliber Spanish-make pistol was found concealed in the glove compartment of his car which had Firestone tires on its rear wheels. There was no evidence of blood stains in the car. The supreme court ruled that the entire chain of circumstances constituted a reasonable basis for the jury's conclusion that Beasley killed Hocker and that that conclusion was clearly "more probable" than that Hocker was killed by some imaginary stranger who also must have had a .38 caliber revolver and a car with Firestone tires, particularly since there was not a scintilla of contradictory evidence respecting the whereabouts of Beasley, or the likelihood of any third-party intervention. On remand, the appellate court held that the jury finding was not against the manifest weight of the evidence. *Hocker v. O'Klock* (1960), 24 Ill. App. 2d 259, 164 N.E.2d 225.

■■ We believe that *Hocker* is controlling here. As there, it is surely more reasonable here to find that the same Spanish-speaking men who got drunk in Josephine's, and who had a gun and who became so rowdy they were thrown out, shot the deceased than that at approximately the same time the trio were ejected from the tavern, there was also another imaginary group of Spanish-speaking men who were drunk and rowdy and who had a gun particularly when the only witness noticed no one else in the street. Accordingly, we find for the plaintiff and thus it was proper to submit the case to the jury.

## II.

■■ However, since the evidence was close enough that the jury might have returned a verdict for either party, it was essential that the trial be conducted in such a way that the jury not be improperly influenced. (*Jacobson v. National Dairy Products Corp.* (1961), 32 Ill. App. 2d 37, 176 N.E.2d 551.) We find that the cumulative effect of the improper admission of Galvan's out-of-court statement that he and Coronado had been in Josephine's Lounge and that Coronado shot the deceased, and the misstatements and improper comments on the evidence in the opening

and closing arguments require us to reverse and remand for a new trial.

Since Galvan's statement was a statement by a party, it could be properly admitted (*Jones v. DeWig* (1974), 25 Ill. App. 3d 423, 323 N.E.2d 475) if it was relevant, but only if it was relevant. (*Gillson v. Gulf, Mobile and Ohio R.R. Co.* (1969), 42 Ill. 2d 193, 246 N.E.2d 269.) The plaintiff contends that the statement was admissible against Galvan to prove malice, a relevant issue since punitive damages were sought. But since Galvan and Coronado had already been declared in default, the allegations in the complaint as to malice were considered established. Furthermore, Galvan's "so-called admission" did not tend to prove malice on his part since he claimed complete surprise at the shooting, and it was, of course, not admissible against Coronado because, *inter alia*, he had probable motive to falsify the facts declared. *Jones v. DeWig* (1974), 25 Ill. App. 3d 423, 323 N.E.2d 475.

■■■ The judge properly instructed the jury that Galvan's statement was received only against Galvan. (*Jones v. DeWig* (1974), 25 Ill. App. 3d 423, 323 N.E.2d 475; *Felker v. Bartelme* (1970), 124 Ill. App. 2d 43, 260 N.E.2d 74.) However, since it was irrelevant, it should not have been admitted at all. Further, since the statement tended to prove all the issues the plaintiff was required to prove, and since the evidence in this case is close, we cannot assume that the jury was able to disregard the information imparted in the so-called admission. Rather, we believe, that this statement "once lodged in the minds of the jury could not be erased by an instruction, and appellee by [the admission] secured the benefit of the fact to the same extent as if [s]he had introduced evidence to prove it." *McCarthy v. Spring Valley Coal Co.* (1908), 232 Ill. 473, 479, 83 N.E. 957.

## III.

■■ The general rule as to statements made by counsel in his opening statement to the jury that certain evidence will be introduced is that such statements are not improper if made in good faith and with reasonable ground to believe that the evidence is admissible, even though the intended proof referred to is afterwards excluded. However, in the absence of good faith, or where prejudice is clearly produced, whether as the result of accident, inadvertence or misconception, the rule is to the contrary. (75 Am. Jur. 2d *Trial* § 208 (1974).) Moreover, no statement should be made in counsel's opening statement to the jury which counsel does not intend to prove or cannot prove. *Gillson v. Gulf, Mobile & Ohio R.R. Co.* (1969), 42 Ill. 2d 193, 246 N.E.2d 269.

■■ We are willing to believe that counsel for the plaintiff at the time he made the opening statement acted in good faith, and still hoped to be able to locate the witness Butler, and that he expected Grove's out-of-

court statements to be admissible. We also agree that the statements were not of the inflammatory nature of the statements ruled prejudicially objectionable in *McCarthy v. Spring Valley Coal Co.* (1908), 232 Ill. 473, 83 N.E. 957; *Colmar v. Greater Niles Township Publishing Corp.* (1957), 13 Ill. App. 2d 267, 141 N.E.2d 652; and *Gillson v. Gulf, Mobile & Ohio R.R. Co.* (1969), 42 Ill. 2d 193, 246 N.E.2d 269, relied on by the defendant. Nevertheless when viewed in the context of this case, since the circumstantial evidence tending to prove the plaintiff's case was not strong, the presentation of facts to the jury through means of the opening statement which in fact the plaintiff could not prove was prejudicial to the defendants.

Far more prejudicial and improper were the misleading and erroneous statements made by plaintiff's counsel in closing argument. In closing argument counsel for plaintiff stated:

"1. that subsequent to the identification of a photograph, the policeman contacted a man by the name of Galvan.

2. the jury could infer that the men who shot Scialabba were the men in the bar from the fact 'that the police officer was able to show photographs of the men to the bartender who was able to select them; to Charles Grove, who was able to select them; to James Price, the entire investigation, all of these things can lead you to the conclusion that these then were or were not the men.'"

Neither of these statements are supported by the evidence, although the evidence for the plaintiff would be much stronger if they were. There is no evidence in the record showing that Officer Kennedy, *after the photographs were identified,* began searching for Galvan. There is no evidence indicating whom the photographs portrayed—they could have been of Price and someone else. There is no evidence that the photographs were shown to Price, much less that he identified them as was implied by counsel's statement. Yet, if Grove had identified the men in the photographs as being the men drinking in the bar and Price had identified the same photographs as being of the men who threatened his companion, the evidence for the plaintiff instead of being weak would have been practically overwhelming. The jury could not but be misled by counsel's statement into believing that there was direct eyewitness identification of the men in the bar as being the ones who assaulted Williams, and, therefore, probably being the ones who assaulted Scialabba. Furthermore, to add to this confusion and augment the prejudicial nature of these remarks, the jury was reminded by plaintiff's counsel that Galvan had made a statement although they "were not to consider it." This reference to the alleged "admission" which had been excluded by the court from jury consideration was prejudicial in itself.

We recognize that counsel in closing statement may be vigorous and

eloquent and make fair comment upon the evidence. (*Darling v. Charleston Community Memorial Hospital* (1964), 50 Ill. App. 2d 253, 200 N.E.2d 149, *aff'd*, 33 Ill. 2d 326, 211 N.E.2d 253, *cert. denied*, 383 U. S. 946, 16 L. Ed. 2d 209, 86 S. Ct. 1204; *Goldstein v. Hertz Corp.* (1973), 16 Ill. App. 3d 89, 305 N.E.2d 617.) He may present the evidence in the light most favorable to his case (*Goldstein v. Hertz Corp.* (1973), 16 Ill. App. 3d 89, 305 N.E.2d 617), and may draw inferences from the evidence. (*Reinmueller v. Chicago Motor Coach Co.* (1950), 341 Ill. App. 178, 93 N.E.2d 120; *Saputo v. Fatla* (1975), 25 Ill. App. 3d 775, 324 N.E.2d 34.) But this does not give him the right to misrepresent the evidence or argue facts not in evidence. (*Wellner v. New York Life Insurance Co.* (1947), 331 Ill. App. 360, 73 N.E.2d 156; *Ryan v. Monson* (1961), 33 Ill. App. 2d 406, 179 N.E.2d 449; *Anderson v. Universal Delta* (1967), 90 Ill. App. 2d 105, 234 N.E.2d 21; *Ferrer v. Vecchione* (1968), 98 Ill. App. 2d 467, 240 N.E.2d 439; *Champion v. Knasiak* (1974), 25 Ill. App. 3d 192, 323 N.E.2d 62.) It also does not give him the right to refer to the fact that certain evidence was excluded by the court. *Crutchfield v. Meyer* (1953), 414 Ill. 210, 111 N.E.2d 142; *Jacobson v. National Dairy Products Corp.* (1961), 32 Ill. App. 2d 37, 176 N.E.2d 551; *Ryan v. Monson* (1961), 33 Ill. App. 2d 406, 179 N.E.2d 449; *Anderson v. Universal Delta* (1967), 90 Ill. App. 2d 105, 234 N.E.2d 21.

■■ ■ We also recognize the fact that generally an assignment of error will not be considered on appeal unless an objection to the alleged prejudicial argument was made in the trial court. Nevertheless, if prejudicial arguments are made without the objection of counsel or interference of the trial court to the extent that the parties litigant cannot receive a fair trial and the judicial process stand without deterioration, then, upon review this court may consider such assignments of error even though no objection was made at the trial level. *Belfield v. Coop* (1956), 8 Ill. 2d 293, 134 N.E.2d 249; *Ryan v. Monson* (1961), 33 Ill. App. 2d 406, 179 N.E.2d 449 (involving both misstatements of the evidence and reference to a ruling excluding evidence); *Ferrer v. Vecchione* (1968), 98 Ill. App. 2d 467, 240 N.E.2d 439 (misstatement or statement of fact not in evidence one of several errors).

■■ We conclude that in an otherwise close case, the cumulative effect of those several errors; the remarks of counsel in his opening statement; the admission of out-of-court statements and the misstatement of evidence in final argument resulted in something less than the kind of fair trial to which all litigants are entitled, and that, therefore, the case must be reversed and remanded for a new trial.

Reversed and remanded.

DIERINGER, P. J., and LINN, J., concur.