(No. 19038.—

THE WHITE STAR MOTOR COACH LINES OF ILLINOIS, Plaintiff in Error, *vs.* THE INDUSTRIAL COMMISSION *et al.*—(BERNICE BAKER, Defendant in Error.)

*Opinion filed June 19, 1929—Rehearing denied October 14, 1929*

HEARD and DIETZ, JJ., dissenting.

GEORGE C. BLISS, and JOHN E. CASSIDY, for plaintiff in error.

HOMER BARNEY, for defendant in error.

Mr. CHIEF JUSTICE FARMER delivered the opinion of the court:

Henry Baker, a motor bus driver employed by the White Star Motor Coach Lines of Illinois, a corporation, died on December 11, 1926, as a result of being asphyxiated on that date with carbon monoxide gas in the company's garage on Fayette street, in Peoria. His widow and minor daughter filed their claim for compensation with the Industrial Commission, and an arbitrator made an award of $15 per week for a period of 273⅓ weeks, which upon review before the Industrial Commission was confirmed. The circuit court of Peoria county quashed a writ of *certiorari* sued out by the motor coach company to review the order of the commission, and a writ of error was allowed to bring the cause to this court.

The record shows no controversy as to the facts. The White Star Motor Coach Lines (hereafter referred to as the company) was engaged in operating gasoline-propelled motor busses from Peoria, Illinois, to several nearby villages and towns. The company maintained a central office, garage and repair department on Fayette street, in the business district of Peoria, where its busses were kept and cared

for when not in use. The office of the garage was a small, enclosed, steam-heated room, having three or four chairs, a telephone and an electric heater in it. The garage proper was about sixty feet wide, twenty feet high and perhaps one hundred feet long. It had large windows and doors in the front and rear and several skylights in the roof. The place of business was not kept open and no workmen were on duty there at night, though it appears that more than one employee had a key to the place. When the garage was closed and locked for the day, which was usually about 6:15 o'clock in the evening, there were no openings whatever in the building. The company employed Daniel Ehnle, a mechanic of seven years' experience, whose duty it was to keep the busses in first-class mechanical condition at all times. Repair work was done by him out on the road as well as in the garage, at which times he was in full charge of whatever work was being done. The deceased, Henry Baker, had been engaged in driving motor busses for more than a year. He lived with his wife and eight-year-old daughter at Henry, Illinois, about thirty-five miles north of Peoria. His employment with the company as a motor bus operator required him to leave Henry at 7:30 each morning for Peoria. Later in the morning he made a round trip over a part of the same route from Peoria to Chillicothe. Upon his return to Peoria in the afternoon he completed the day's work by taking a bus to Henry, where he stayed all night at his home. On the afternoon of December 10, 1926, while making his return trip to Henry, the bus he was driving became disabled and he was forced to stop at Sparland, a small town about twenty-six miles north of Peoria and nine or ten miles from Henry. Baker telephoned to one of the company's employees at Peoria, advising that his bus was broken down and requesting that a mechanic be sent to fix it. The employee was unable to locate the mechanic but left the necessary word with the

mechanic's wife at his home and also communicated with Dentino, the company's manager and secretary, after the latter had come in from a bus trip to Farmington. About 9:45 P. M. Dentino talked over the telephone with Ehnle, who had gone to the company's garage for the purpose of securing some repair parts for the disabled bus, and Ehnle told the manager he would go right out to Sparland and make the repairs. Ehnle had a Dodge roadster automobile which he used in making repair calls out on the road, and he stopped for gas between 10:00 and 11:00 P. M. at the Sweeney oil station, in Peoria, which is only a few doors from the bus company's garage. Baker had not received the necessary mechanical assistance after two telephone calls to Peoria, and about 9:00 P. M. he telephoned to George Pelini, president of the bus company, at his home in Chillicothe, and told him of his predicament. Pelini told Baker the latter had better go home, but Baker replied he would wait for the mechanic. Ehnle, driving his Dodge roadster, reached Sparland about 12:30 A. M. The disabled bus had been placed in a garage at Sparland and Ehnle and Baker worked on the bus there for more than an hour. They were unsuccessful in making the necessary repairs, and about 2:30 A. M. they drove back to Peoria in Ehnle's roadster. Baker and Ehnle were seen at the Sweeney oil station, near the company's garage in Peoria, between 4:00 and 4:30 A. M. and were in a restaurant about a block from the bus company's garage between 4:30 and 4:50 A. M. Baker had something to eat there, and they inquired of the restaurant keeper if they could "flop there for an hour." The restaurant keeper testified they said "they would have to get some kind of a crawl-in and would have about an hour to wait until they could make their run back." The restaurant man also heard one of the men say to the other, "We will have to get out of here and go over to the garage and rest an hour and start out at six." Ehnle had on his work clothes and Baker had his leather jacket and cap on

when they left. Another driver and employee of the company, named Robb, came to the garage about 7:40 on the same morning, December 11. The building was closed and he unlocked the doors. Upon opening the front doors he found the garage was full of smoke. He heard an engine of one of the busses running but could hardly see the bus for the dense smoke. He also saw Ehnle's roadster sitting inside the garage to the left of the entry. He went back to the bus, which was in the extreme rear and was headed toward the back doors, found its windows closed and its front door locked. He looked into the bus and saw someone sitting in it. He lowered a window, climbed into the bus and found Ehnle and Baker therein. Robb shut off the motor, which was running a little faster than idling speed, and opened up the bus and garage doors for fresh air. The bus was warm inside and full of gas. Both men were unconscious. Ehnle was sitting up in the third seat on the left-hand side of the bus and his head was resting back against the window. He had his overcoat and cap on. Baker was on the floor, on the same side, between the first and second seats. His feet were stretched out across the center aisle and his head was against the side of the bus. He had his leather jacket on but no hat. The men were removed from the bus, medical services were immediately secured and they were then taken to the hospital. Neither of them regained consciousness. The cause of death is agreed to have been due to carbon monoxide gas poisoning and internal asphyxiation. The record shows that Robb, who first saw the men in the bus, found an alarm clock sitting just inside the door of the bus. The clock was the one usually kept near one of the windows in the front end of the garage. Another witness, who took the clock out of the bus, stated that it belonged to Ehnle, that its alarm had been set for six o'clock and had partially run down. .

It appears that the company had three or four busses in reserve, for use in case of any emergency that might

arise. When a bus or coach became disabled it was the duty of the bus driver in charge to ascertain the trouble, if possible, report the situation to the Peoria office, and stay with the disabled bus until mechanical aid arrived. The driver was to assist the mechanic upon his arrival, if such was necessary or if he was requested to do so. If a bus was disabled to such a degree that it could not be repaired the company would send out another bus to the driver of the disabled one. However, if a driver was unable to communicate with the Peoria office or to get a bus delivered to him, it was a part of his duty to return to Peoria and obtain a serviceable bus. The purpose of this custom or arrangement was to maintain the continuity of the bus schedule as nearly as possible. There is testimony in the record showing that a bus in good mechanical condition would have been sent to Baker or delivered at Henry so that Baker could have left there on the regular bus schedule at 7:30 the following morning had Baker made a request therefor. There is also evidence that everyone employed by the company had sufficient automobile experience to know that they should not run the engines of the busses while they were in the garage with the doors of the building closed.

The only question presented for our consideration is whether the accident was one arising out of and in the course of the employment. The proof contained in the record warrants the statement that Ehnle, the mechanic, was evidently unable to repair Baker's bus at Sparland in time for Baker to take it to Henry and be ready to leave the latter place in the morning at 7:30 on his regular schedule for Peoria. Hence it became the duty of Baker to either have someone bring another bus to him from the company's garage at Peoria or go there for the bus himself. Perhaps on account of the lateness of the hour when he and Ehnle finished working on the disabled bus at Sparland, Baker decided upon the latter course and returned with Ehnle to Peoria. There is no direct evidence as to what Baker and

Ehnle were doing or intended to do from the time they reached the garage after being at the restaurant nearby at 4:50 A. M. and the time they were found in the bus, unconscious, by Robb at 7:40 the same morning. However, the only reasonable conclusion from all the evidence and circumstances is that the two men were in the bus for the purpose of resting and sleeping for about an hour. Thereafter Baker, under ordinary circumstances and conditions, could have driven a bus from Peoria to Henry, a distance of approximately thirty-five miles, and been ready to leave the latter place at 7:30 A. M. for the regular return trip. Apparently no better reason can be advanced for the running of the motor than to furnish some heat in the bus while the men slept. These men were experienced with automobiles, and must have known the danger of running a gasoline engine in a motor car while in an enclosed place or building.

The Workmen's Compensation act is designed to protect workmen and compensate them for injuries received while performing any duty necessary to be performed in the course of their employment or incident to it. It was not intended by the act that the employer who comes within its provisions shall be the insurer of the safety of his employees at all times during the period of the employment. This court has said that to recover for an accident under the Workmen's Compensation act it must result from a risk reasonably incidental to the employment; that an accident arises in the course of the employment if it occurs while the employee is doing what a man so employed may reasonably do within a time during which he is employed and at a place where he may reasonably be during that time to do that thing; that an accident arises out of the employment when it is something the risk of which might have been contemplated by a reasonable person when entering the employment, as incidental to it. A risk is incidental to the employment when it belongs to or is connected with

what a workman has to do in fulfilling his contract of service. (*Weis Paper Mill Co.* v. *Industrial Com.* 293 Ill. 284.) Where an employee chooses to go to a dangerous place where his employment does not necessarily carry him and where he incurs a danger of his own choosing and one altogether outside any reasonable requirement of his employment, it cannot be said that such risk was an incident to his employment. (*Terminal Railroad Ass'n* v. *Industrial Com.* 309 Ill. 203.) For an accident to arise out of the employment the act of the employee must be reasonably incidental to his employment. The employee must not unnecessarily increase the risk of injury to himself beyond that contemplated in his contract of employment. He may not choose an unnecessarily dangerous place for the doing of acts of his employment nor may he do them in an unnecessarily dangerous way. (*Weis Paper Mill Co.* v. *Industrial Com. supra.*) It would not be considered as a reasonable incident of the employment that a bus driver, who had come to the company's closed garage late at night for the purpose of taking out a regular service passenger bus for an early morning schedule, would get into a closed bus for an hour's rest and sleep, lock the door, start the engine, and, with the doors and windows of the garage closed, take the chances of being suffocated by the gas and fumes from the engine exhaust. Had Baker desired to rest or sleep he could have made use of any one of the nearby hotels or occupied the office of the garage, which was equipped with heating facilities and chairs. Without any knowledge or acquiescence on the part of his employer Baker chose a place to rest and sleep which under all the circumstances was an unreasonably dangerous place, and by so doing he exposed himself to an unnecessary risk. He voluntarily incurred an additional risk not within the contemplation of his contract of service. An employee cannot accept such unnecessary risk and danger without taking him outside the scope of his employment.

In our opinion, by going into the unnecessarily dangerous place and incurring such additional risk Baker went outside any reasonable requirement of his employment, and compensation should not be allowed for his accidental death.

The judgment of the circuit court will therefore be reversed.

*Judgment reversed.*

HEARD and DIETZ, JJ., dissenting.