(No. 25531.—

HARRY ROSENFIELD, Defendant in Error, *vs.* THE INDUS-TRIAL COMMISSION *et al.*—(MARIA GAGGINI *et al.* Plaintiffs in Error.)

*Opinion filed June 14, 1940—Rehearing denied October 2, 1940.*

Wilson, J., dissenting.

Augustine J. Bowe, William J. Bowe, and Albert M. Howard, for plaintiffs in error.

Henry L. Kane, (Arthur O. Kane, of counsel,) for defendant in error.

Mr. Justice Stone delivered the opinion of the court:

This court granted a writ of error to the circuit court of Cook county to review a judgment of that court setting aside an award of the Industrial Commission in favor of plaintiffs in error Maria Gaggini, widow, and three minor children, survivors of Settimo Gaggini, who met his death while in the employ of defendant in error. The sole question involved is whether the evidence sustains the finding of the Industrial Commission that the accidental injury, resulting in the death of Gaggini, arose out of and in the course of his employment.

It is settled in this State that courts may not, on review of an award made by the Industrial Commission, disturb factual determinations of that body, unless the same be manifestly against the weight of the evidence. (*Rodriguez* v. *Industrial Com.* 371 Ill. 590; *Green* v. *Industrial Com.*, 337 id. 514; *Donk Bros. Coal and Coke Co.* v. *Industrial*

178

*Com.* 325 id. 193.) The rule likewise is that the petitioner has the burden of establishing, by clear and convincing evidence, that the accidental injury arose out of and in the course of the employment. (*Shell Petroleum Corp.* v. *Industrial Com.* 366 Ill. 642; *Boyer Chemical Co.* v. *Industrial Com.* id. 635; *Mirific Products Co.* v. *Industrial Com.* 356 id. 645; *Harding* v. *Industrial Com.* 355 id. 139; *Jersey Ice Cream Co.* v. *Industrial Com.* 309 id. 187; *Mix Dairy Co.* v. *Industrial Com.* 308 id. 549.) An injury, to be compensable, must arise from a risk reasonably incidental to the employment and not one suffered by the public generally. A risk is incidental to the employment when it belongs to or is connected with what an employee has to do in fulfilling his contract of service. (*White Star Motor Coach Lines* v. *Industrial Com.* 336 Ill. 117; *Weis Paper Mill Co.* v. *Industrial Com.* 293 id. 284.) Liability under the Workmen's Compensation act cannot rest upon imagination, speculation or conjecture, nor upon a choice between two views equally compatible with the evidence, but such liability must arise out of facts established by a preponderance of the evidence. *Mirific Products Co.* v. *Industrial Com. supra; American Smelting Co.* v. *Industrial Com.* 353 Ill. 324; *Allith-Prouty Co.* v. *Industrial Com.* 352 id. 78.

The undisputed evidence is as follows: Gaggini, at the time of his death on December 3, 1937, was thirty-five years of age. He was employed by defendant in error to sell plaster, lacquer and other materials used in the manufacture of plaster statuary and other like novelties. Most of his customers were his countrymen living in the neighborhood of Scott street and Ogden avenue in the city of Chicago. He used his own automobile, and sold by samples which he carried with him. He also frequently collected the sale price. He worked on a commission, which was increased over the sales commission when he also collected for the sale. His collections ran from $150 to $200 per week.

About 11:30 o'clock in the morning of December 3 Gaggini came to his home for lunch and left again about 12:25, saying he had a busy day. He told his wife to get the children ready by the time he returned home and they would go to an Italian theater that evening. About 1:00 P. M. that day he was seen by a fireman at a fire-engine house near the Ogden avenue viaduct, falling from the viaduct onto the pavement below, at the junction of Scott street with Halsted street. A drizzling rain was then falling. Earlier in the day there had been a hard rain and the pavements were wet. The Ogden avenue viaduct at this point extends in a curve from the northeast over the end of Scott street and alongside and onto Halsted street. Scott street extends east from Halsted street, the latter being a north and south street. The fire-engine house is on the west side of Halsted street opposite the end of Scott street. Gaggini fell from the east side of the viaduct near the north line of Scott street so that his body was not seen until it passed below the arch of the viaduct. Witness Arthur J. Waldie, a captain of the fire department, testified that he saw what at first appeared to be a blanket falling from the opposite side of the viaduct. Gaggini's house was across Scott street but a short block from where he fell. Waldie testified that he soon saw it was a body falling. It struck the concrete pavement on head and shoulders. The body, as it came down, did not turn over in the air but the head and shoulders were to the west while the feet, with toes pointed upward, extended to the east. The body was falling with the back on the under side, head and shoulders being lower than the feet. When the witness reached the body he found it was Gaggini. When the body struck it seemed to roll. When Waldie reached it, it was lying face up. The back of the head was crushed and Gaggini was dead. Waldie saw no sign of life in the body. Before leaving the station he had signalled his men to come. A rubber-faced blanket was brought and Waldie and other

firemen turned the body over and rolled it in the blanket. He saw *vomitus* on the front and back of his clothing. He testified that he did not see anyone on the viaduct; that a person walking on the east side of the viaduct could not be seen from where he stood in the station when he saw the body fall, unless such person was on the west railing of the viaduct, and that a wide footwalk extended along the east side of the viaduct. This viaduct has six lanes for vehicular traffic. The railing consists of a concrete curb about 16 to 20 inches wide and 20 inches or more high and is surmounted by a railing with openings in it. The record does not clearly disclose the height of this railing nor what it is made of, but does suggest that the upper part or railing may be of iron or concrete and two or three feet in height above the curb. There are also openings in the railing, but whether large enough to permit a human body to pass through is not disclosed by the record.

Waldie went upon the viaduct and found Gaggini's car standing at the east curb of the east traffic lane alongside the footwalk. It was headed north. The keys were in the ignition lock but the motor was not running. Others testified that the position of the key indicated that the ignition had been turned off. There was evidence of *vomitus* around the inside of the car, on the footwalk and on the railing above where Gaggini's body lay. His shoes were off, and lay in the car against the footboard, near the right-hand front door, with the toes pointed toward the motor. One was right side up and the other was turned over. A brown wallet lay on the front seat with papers scattered around on top of it. They appeared torn or mussed and were spotted with *vomitus* or some such appearing substance. Sales samples were in the back of the car. Gaggini's wife testified that that day, while at home for lunch, he put some currency in his right shoe, and that he frequently carried money that way. There was no dispute of this

testimony. Gaggini had collected $7.20 for his employer the evening before his death, which had not been turned in. When the body was searched, two paper dollars were found in his vest pocket but no other money was found.

These are substantially the undisputed facts. Beyond this point there is dispute in the evidence. Waldie testified that when he came to Gaggini's body the soles of his feet were dry. On cross-examination he was asked: "You said his feet were wet?" and he replied: "Yes sir." The question was directed to his testimony in chief, which was that the feet were dry, and that he took hold of the ankles to turn the body over. Whether he misunderstood the question on cross-examination is not clear. No attempt was made to clear up the matter or have him change his testimony. Henry LaBarbera, a garageman whose place of business is near where Gaggini fell, also testified that when the officers picked up the body he noticed the feet were dry with the exception of the back of one heel which had lain in a slight depression or ditch with water in it. He seemed confused as to what the "soles" of the stockings are, saying he did not see them, also that the body was picked up by the "sole or upper."

Edith Barsi, daughter of the woman operating the funeral establishment to which the body was taken, testified that Gaggini's feet were dry; that he had on black stockings; that she did not feel them but was quite close to them.

On the other hand, on review before the Industrial Commission, officer John Currin testified that when he saw the body, shortly after it fell, the feet looked a little damp. He did not detail what examination he made. Officer Joseph Newbauer testified that he first noticed the feet in the undertaking parlor and that they were then wet. He stated that he did not know whether his stockings were wet when the body fell, but that it had been raining. The

feet were not under the blanket but were exposed and water had been dripping over them. The blanket used was rubber-faced.

The arbitrator was of the opinion that Gaggini was robbed and assassinated but that his employment had no causal connection with his death and robbing, but indicated personal vengeance. The Industrial Commission found that Gaggini's death arose out of and in the course of his employment.

Counsel for plaintiffs in error argue that proof that Gaggini's feet were dry when his body struck the pavement disproves suicide and indicates murder, and if their witnesses are to be believed that contention is correct. All witnesses agree that the pavements were wet. The footwalk between Gaggini's car and the railing of the viaduct is thirteen feet in width. No one could spring from that car and over the rail, nor could he traverse thirteen feet of wet pavement in his "sock feet" without getting his feet wet. The arbitrator and Industrial Commission are triers of the facts and we are not justified in setting aside an award unless it is clearly and manifestly against the weight of the evidence. If the Industrial Commission chose to believe that Gaggini's feet were dry when he fell, we cannot say that they were not justified in so believing. While there was evidence of his having vomited, and the disputed testimony of some witnesses that a partly filled, open can of lacquer was found on the front seat of the car, yet, as we have seen, the dry feet of Gaggini, if they were dry, renders impossible the suicide theory. Medical testimony was offered to show that vomiting may be produced by trauma and other causes. No examination of the stomach was made.

It must be conceded that Gaggini was in the course of his employment at the time he met his death. It is, however, incumbent on the applicant to prove also that his death arose out of his employment, and that there was some

causal connection between the two. *Shell Petroleum Co.* v. *Industrial Com. supra; Boyer Chemical Co.* v. *Industrial Com. supra.*

The evidence shows that Gaggini had been selling and collecting for defendant in error for some years, at times turning in as high as $200 per week in cash. That this fact was known in that neighborhood seems not improbable. He had, on the day before, collected a bill for $7.20 which had not been turned in at the time of his death. The widow testified that before leaving that day he put more than $10 in currency in his shoe. His shoes were off and in the car at the time of his death. As to the theory of personal vengeance, adopted by the arbitrator, numerous witnesses testified before the Industrial Commission, on review, that Gaggini was a pleasant, jovial and friendly person and that they knew of no one who might be his enemy. He was a young man whose income was about $2000 per year from his employment. These undisputed facts, together with the fact that his shoes had been removed from his feet, are facts that give rise to a reasonable inference that the motive for his assassination was robbery under the belief that he was carrying his employer's money. That he frequently had sums of money of his employer on his person is not disputed. That fact created a hazard incident to his employment and to which the public was not exposed.

Witnesses first on the scene examined the car and described evidence of a struggle in it. Bags of plaster were broken and scattered. Cases of the lacquer were lying on the floor of the automobile. If this testimony is to be believed, a struggle of some sort had taken place. Others who saw the car did not observe such evidence of a struggle. It was the province of the Industrial Commission to weigh this testimony.

Controverted facts may be said to be established when the evidence, though circumstantial, creates a greater or less probability leading, on the whole, to a satisfactory con-

clusion. This is all that can reasonably be required. *Ohio Building Safety Vault Co.* v. *Industrial Board*, 277 Ill. 96.

It must be conceded in logic, and so in law, that the Industrial Commission may act on reasonable inferences arising from undisputed or established facts. Such inferences do not lie within the realm of conjecture. This court may not discard such permissible inferences because perchance it might have drawn from such established facts other inferences, unless the inferences drawn by the Industrial Commission are unreasonable. *Allith-Prouty Co.* v. *Industrial Com. supra; Ohio Building Safety Vault Co.* v. *Industrial Board, supra.*

The facts proved in this case, and reasonable inferences to be drawn therefrom, afforded basis for the Industrial Commission's conclusion and this court should not disturb that conclusion. The circuit court erred in so doing. Its judgment is, therefore, reversed, and the award of the Industrial Commission confirmed.

*Judgment reversed, award confirmed.*

Mr. JUSTICE WILSON, dissenting.