Martha Zahn, Appellee, v. Joseph Muscarello, Victor A. Juric, Karl Reidelmaeier and Lena Reidelmaeier, Appellants.

### Gen. No. 44,221.

Opinion filed December 30, 1948. Released for publication January 18, 1949.

EKERN, MEYERS & MATTHIAS, of Chicago, for appellants; DONALD L. THOMPSON and WILLIAM G. CHORN, both of Chicago, of counsel.

KAMFNER & HALLIGAN, of Chicago, for appellee; MARTIN K. IRWIN, EDWARD A. HALLIGAN and PAUL DENVIR, all of Chicago, of counsel.

MR. JUSTICE FRIEND delivered the opinion of the court.

Martha Zahn, widow of John Zahn, brought suit for damages and loss of means of support under section 14, article VI of the Dram-Shops Act (Ill. Rev. Stat. 1947, ch. 43, par. 135 [Jones Ill. Stats. Ann. 68.042]) against Joseph Muscarello, operator of a tavern, Karl and Lena Reidelmaeier, individually and as beneficiaries under a certain trust pertaining to the property in which the tavern owner was a tenant, and Victor A. Juric, individually and as trustee of said property. Trial by jury resulted in a verdict finding all defendants guilty and assessing damages in the sum of $5,000. The court denied each defendant's motion for a directed verdict at the close of all the evidence, dismissed the cause as to Victor A. Juric as trustee but not individually, and entered a unit judgment on the verdict, from which defendants appeal.

As one of the two principal grounds for reversal it is urged that plaintiff failed to prove that Zahn's death was the proximate result of his intoxication, that the verdict of the jury was based upon speculation and cannot stand because it is not supported by competent proof, either direct or circumstantial, and that accordingly the court erred in denying defendants' motion for a directed verdict or for a judgment notwithstanding the verdict. It therefore becomes necessary at the outset to detail the evidence upon which the verdict was predicated. There is substantially no controversy between the parties as to the salient facts. At the time of the occurrence plaintiff lived with her husband at 1942 Wabansia avenue in Chicago. She was then 62 years of age, and he was 63. On Monday, Novem-

ber 5, 1945, Zahn, who was in good health, left his home at 7:30 in the morning, and worked that day at the Hercules Trunk Works, located at 1302 North Halsted street. He punched out at 4:30 p. m. His occupation was that of carpenter, at a wage of $1.10 per hour. November 5 was his pay day, and after work he received his salary check of $37.46. He then went to the tavern at 1300 North Halsted street, adjoining his place of employment, at that time operated by the defendant Muscarello, cashed his check there, and had a bottle of beer and a sandwich. Later that day, between 6:00 and 7:00 p. m., he was seen in the same tavern by plaintiff's witness Bourdes. He testified that he saw Zahn drinking, but did not know what he was drinking or how many drinks he had. He was of the opinion that Zahn was intoxicated. Plaintiff's witness Massie, who was Zahn's employer, saw him in the same tavern between 7:30 and 8:00 p. m. He saw Zahn drinking some beer, and observed an empty whiskey glass in front of him. He testified that Zahn knocked over some beer, "that he didn't seem to be able to control himself," and that he didn't look normal. "To my way of thinking—maybe I am wrong —he looked to me like he was intoxicated."

Before Zahn went to work for the Hercules Trunk Company he was employed in the construction of boats and earned about $300 a month. At the time of his death he owned a tugboat called the "Chicago," on which he sometimes slept. The boat was moored or tied up about 200 feet south of North avenue on the east bank of the Chicago river. There was a perpendicular retaining wall along the east bank of the river which was constructed of piling and planks, and extended three to five feet above the water. The top part thereof was level with the ground. To board the boat one stepped from the bank onto the deck. The boat was furnished with cooking and sleeping quarters.

Zahn used this boat to pull barges, which at times gave him an additional revenue of several hundred dollars per month.

Reverting to the scene in the tavern, it appears that Massie, realizing Zahn's intoxicated condition, suggested taking him home. Bourdes testified that Zahn did not walk out of the tavern by himself, but required the active help and assistance of Massie; in fact, he stated that Massie was forced to lift Zahn by his shoulders and place him in an automobile; that Zahn was intoxicated and his actions indicated that he was not feeling well. Massie and Bourdes then drove him to the dock where Zahn's boat was tied. Arriving there, Massie helped him from the car. Massie described Zahn's physical condition after leaving the car as follows: "He walked weak to me; his legs seemed to buckle up under him." They walked about a block from the car to the boat. Bourdes remained behind in the car and waited for Massie to return. After Massie and Zahn stepped onto the boat the latter unlocked the door, entered the cabin and lit an old-style kerosene lantern. Massie remained there with him for about five minutes, and then returned to his car. Before leaving, Zahn told Massie that he was all right and that he was going to bed. Massie was the last person who talked to Zahn and the last to see him alive.

Tuesday morning, November 6, Zahn failed to report for work. Plaintiff testified that when he failed to come home with his pay check on Monday, she went to the boat on Tuesday, November 6, to look for him. In a prior deposition she had stated that Zahn was supposed to make a trip with another man to Mexico, and she was not concerned about his absence until Friday, November 9. Raymond Zahn, plaintiff's son, testified that he went to the boat Tuesday noon, November 6, after receiving a telephone call from his mother, observed the cabin of the boat unlocked, but did not find

his father on the boat. On Wednesday, November 7, Raymond and his mother looked for Zahn at a near-by fishhouse and in several taverns in the neighborhood, and failing to locate him, called the police on November 9. The Coast Guard, at the request of the police, then dragged the Chicago river, and found Zahn's body about 9:50 a. m., Saturday, November 10, a few feet west of the point where the boat was moored when he last went aboard it. The body was fully dressed with coat, pants and shoes, but there was no hat. Sixty-five cents were found in his trousers, but there was no paper money in his wallet. The police also found on the body a gold open-faced watch, with the hands stopped at 8:33½. Massie had testified that he left Zahn on the boat about 8:30 p. m. The body when recovered had a strong odor, and one of the police officers testified that in his opinion it had been in the water several days. From a photograph received in evidence, it appears there was no railing around the boat.

At the request of defendants the two following interrogatories were submitted to the jury, which they answered in the affirmative: Interrogatory No. 1—Did John Zahn come to his death in consequence of his intoxication on November 5, 1945; and Interrogatory No. 2—Was the intoxication of John Zahn the proximate cause of his death? In defendants' motions for judgment notwithstanding the verdict and for a new trial, they moved to set aside the answers to these special interrogatories. Their motions were denied.

Upon this evidence, defendants argue that several causes of death might be conceived which would be just as consistent with the evidence as the theory of death resulting from Zahn's original intoxication. It is suggested that he might have left the boat the morning of November 6, after he had recovered from his drunkenness, gone to other taverns in the vicinity, become reintoxicated and fallen from the boat that day

or any day thereafter, in which event defendants would not be liable; that he might have had a heart attack and fallen from the boat; that a robber might have entered the boat, taken Zahn's money, and pushed him overboard; that he might have committed suicide any day after November 5; and finally, that he might have been killed while on shore and his body thrown in the river. However, there is no evidence to support any of these theories. Zahn was never seen alive after 8:30 p. m. on November 5, and the watch found on his person stopped some three minutes after 8:30. The evidence discloses that Zahn was not a habitual drinker, and that he had been steady in his employment. There was no evidence which would permit of an inference that he continued in a drunken state for a period of days, or that he was robbed or murdered, or that he committed suicide. The decomposition of the body indicated that it had been in the river several days. All of these circumstances were submitted to the jury for their consideration, and we think there was sufficient evidence to justify a verdict for plaintiff, and the affirmative answers to the two interrogatories indicating that Zahn came to his death in consequence of his intoxication on November 5 and that his intoxication was the proximate cause of his death.

Defendants argue that the jury were obliged to guess or speculate as to these facts because the evidence was purely circumstantial. Courts have always considered it within the province of the jury, or any other trier of facts, to make reasonable inferences from established facts, and such permissible inferences will not be discarded by a reviewing court because other inferences might have been drawn from such established facts, unless the inferences drawn are unreasonable. *Rosenfield v. Industrial Commission,* 374 Ill. 176. There is abundant authority for the proposition that in civil cases the cause of death, as well as the time of death, are facts that may be established by

circumstantial evidence. *Wilkinson v. Aetna Life Ins. Co.*, 240 Ill. 205; *Goldstein v. Metropolitan Life Ins. Co.*, 324 Ill. App. 168; and *Rogers v. Prudential Ins. Co.*, 270 Ill. App. 515. In cases involving similar facts courts have held that the weight of evidence is a question for the jury. *Veselsky v. Bankers Life Co.*, 248 Ill. App. 176, involved a like situation. The sole question there presented was whether there was sufficient evidence from which the jury could properly conclude that the deceased had come to his death from drowning on July 19, 1924. It appeared that Veselsky was in the habit of swimming in Lake Michigan, and would undress at the foot of the beach in the evening and leave his clothes there before entering the water. He was not an expert swimmer, but could swim about 30 feet. He maintained a tailor shop in Lake Forest, but resided with his family in Berwyn. His wife last saw him alive on the afternoon of July 19, 1924, which was a Saturday. On the following Monday, his clothes were found on the beach under some bushes. His widow testified that he had not slept in his bed since Saturday. Evidence showed no marital or financial difficulties. His body was never recovered. Relative to these circumstances the court said that "Death, like any other fact, may be proved by circumstantial evidence alone, *Fidelity Mut. Life Ass'n v. Mettler,* 185 U. S. 305, and the presumption of the continuance of life prevails until facts are shown which make the presumption of death more reasonable. . . . Applying as nearly as possible the general principles stated in the foregoing and other like cases to the instant facts, we conclude that the question of whether Joseph Veselsky came to his death by drowning on the date alleged was a question of fact for the jury to determine. When a person's clothes are found on a lonely beach and no one is seen either on the land or in the water to whom they belong, the mind instinctively suspects that the owner has drowned. This would be

the usual and a reasonable suspicion. If the clothes are subsequently identified as belonging to a nearby resident, who is never seen again even after a lapse of years, and there is nothing in his domestic or business relations to furnish a motive for voluntary disappearance, the suspicion first entertained ripens into a belief that the absent one came to his death by drowning.'' The case at bar presents a much stronger situation because Zahn's body was found under circumstances which certainly raised a strong inference of death caused by drowning. Also to the same effect see *Metropolitan Life Ins. Co. v. James,* 225 Ala. 561, 144 So. 33, wherein it was said: ''The fact of death is known from the finding of the dead body. In ascertaining the time or date of death in such case, all the facts and circumstances are to be considered.'' (Citing 17 C. J. 1178, sec. 31.)

Defendants further argue that plaintiff cannot recover because the proof to sustain her case is necessarily based on one or more presumptions which in turn are based on a previous presumption. They say that an inference or presumption must first be made that deceased came to his death by drowning, secondly that he was intoxicated at the time he drowned, and lastly that the intoxication was the proximate cause of his death. In the *Veselsky* case the court disposed of a similar contention as follows: ''It is argued that the presumption that the insured was drowned rests upon the presumption that he was swimming or in the water and that one presumption cannot rest upon another. This is not a case of two presumptions. There is simply one general presumption—that he lost his life in the water. *Fanning v. Equitable Life Assur. Soc. of United States,* 264 Pa. 333, 107 Atl. 715.'' After a careful examination of the record we think there was no error committed in denying defendants' motions for a directed verdict, for judgment notwithstanding the verdict or for a new trial.

As the second ground for reversal it is urged that Victor A. Juric was not a proper party defendant, and his counsel argue that if we should so hold it would be necessary to reverse the judgment and remand the cause for a new trial as to all the defendants. The state of the record with respect to Juric is as follows: Paragraph 1 of the amended complaint charged in substance that on November 5, 1945 he, individually and as trustee, as well as other of the defendants, owned and was in active possession, operation and control of the premises in question, and that prior to that date the defendant Muscarello leased the premises from Juric and other of the defendants, and used and occupied them as a tavern wherein alcoholic liquors were sold. Defendants' answer admitted that for some time prior to November 5, 1945, Juric owned the premises pursuant to a deed in trust, but averred that he had no right, title or interest in or control over the premises as an individual. No evidence was introduced upon the trial to prove the charge of the amended complaint or to disprove the averments of the answer. Defendants admitted and stipulated that Karl Reidelmaeier, one of the beneficiaries under the trust, leased the premises used as a tavern to Muscarello, and this admission was confirmed by the testimony of Reidelmaeier, who stated that he lived on the premises, did the janitor work and made necessary repairs, executed leases and collected the rents. At the conclusion of plaintiff's evidence Juric's counsel presented a motion for a directed verdict as to him, both individually and as trustee. That motion was denied as to Juric individually but allowed in his capacity as trustee. Again at the conclusion of all the evidence a motion for directed verdict with attached peremptory instruction was made in behalf of Juric as an individual, but that motion was also denied and the instruction refused. Thereafter the jury returned a verdict against Juric jointly with the other defendants and judgment was

entered on this verdict. In due course a motion was filed wherein it was specifically requested that judgment in favor of Juric be allowed, notwithstanding the verdict, inasmuch as the evidence disclosed as a matter of law that Juric had no right, title or interest in the tavern in question and therefore was not a proper party defendant in the suit. That motion was also denied by the court. The sum and substance of defendants' argument is that it was the intention of the legislature, under section 14 of article VI of the DramShops Act [Ill. Rev. Stat. 1947, ch. 43, par. 135; Jones Ill. Stats. Ann. 68.042], to include as defendants only those persons who had a rentable interest in real estate which they could control at the time and to exclude those who were in no way responsible for the renting, control or disposition of the property. Since plaintiff concedes that Juric was not a proper party, we are not called upon to construe the statute. It is certain that defendants made every attempt to have him dismissed from the proceeding, but without avail. The court required him to continue as a defendant in his capacity as an individual, with a resulting verdict and judgment against him, along with the other three defendants. Since both parties concede that he was not a proper party defendant in the proceeding, either individually or in his capacity as trustee, the question presented is whether the judgment may be reversed as to him and affirmed as to the other defendants. Defendants insist that the reviewing court has no power to sever the judgment. The earlier cases in this State adopted the common-law doctrine that a verdict or judgment against several tortfeasors could not be reversed as to some and enforced as to others, and that a new trial could not be granted as to some and denied as to others; but gradually the courts of this State relaxed the technical common-law rule whenever its enforcement tended to impede the practical administration of justice. *Illinois Cent. R. Co. v. Foulks,* 191 Ill.

57; *Siltz v. Springer*, 236 Ill. 276; and *Pecararo v. Halberg*, 246 Ill. 95. The theory and reasoning underlying these decisions is contained in an able and authoritative discussion of the subject in 143 A. L. R. 16, as follows: "The grounds or reasons most commonly assigned for this enlightened view are that, since the liability of joint tort-feasors is not only joint but also several, and since the plaintiff could have sued one, some, or all of them, or, having sued all, could, before verdict, have dismissed the suit as to some, or, after verdict and judgment against all, have enforced it against one and not against the other, there is no logical reason in depriving him of the benefit of a verdict and judgment rendered in his favor, as against those as to whom no error was committed, merely because as to some of the defendants (whom he could have refrained from suing or as to whom he could have dismissed the suit) an error was committed, unless the rights of the codefendants were so interwoven as to be interdependent, or unless the liability of the unsuccessful defendant necessarily or unavoidably depended upon the liability of the codefendant as to whom a new trial or reversal is granted, or unless the circumstances of the trial or the condition or situation of the parties are such that it is evident that the verdict rendered against all would not have been rendered against one if that one had been separately sued, or that otherwise injustice would result to the complaining codefendant from the reversal of the judgment as to his codefendant without a reversal also as to him."

Paragraph (f) of section 92 of the Civil Practice Act (Ill. Rev. Stat. 1945, ch. 110, par. 216 [Jones Ill. Stats. Ann. 104.092, subd. (f)]) was undoubtedly enacted to obviate the binding effect of the common-law rule. It provided: "In all appeals the reviewing court may, in its discretion, and on such terms as it deems just,— . . . (f) Give any judgment and make any order which ought to have been given or

made, and make such other and further orders and grant such relief, including a remandment, a partial reversal, the order of a partial new trial, the entry of a remittitur, or the issuance of execution, as the case may require.'' In effect, that section provides that the Supreme or Appellate Courts may, under proper circumstances, affirm the judgment as to some and reverse it as to other defendants. It was so interpreted in the first case that came before the Supreme Court in *Minnis v. Friend,* 360 Ill. 328, wherein the court said: ''Counsel for Minnis contend that although heretofore we have held that tort judgments against more than one defendant are not divisible and that a reversal as to one such defendant works a reversal as to all, (*Livak v. Chicago and Erie Railroad Co.,* 299 Ill. 218,) paragraph (f) of section 92 of the Civil Practice act permits a reviewing court to reverse a judgment as to one and to affirm as to another defendant,'' and after setting out the foregoing provision of the Act and discussing various contentions made by defendant, concluded: ''There is no substantial reason to impel us to adhere to the common law rule that a judgment is a unit where it is clear that no right of action existed, as a matter of law, against one defendant, . . . but a cause of action is proved against the other defendant . . . . In addition, section 4 of the Civil Practice act [Ill. Rev. Stat. 1947, ch. 110, par. 128; Jones Ill. Stats. Ann. 104.004] provides that the act shall be liberally construed, to the end that controversies may be speedily and finally determined according to the substantive rights of the parties. . . . We hold that under the Civil Practice act the judgment is not a unit but is divisible.''

The reasoning of the court in the *Minnis* case was subsequently followed in *Crane v. Railway Express Agency, Inc.,* 369 Ill. 110, wherein Mr. Justice WILSON, speaking for the court, concluded the opinion as follows: ''Upon the authority of paragraph (f) of section

92 of the Civil Practice act, (*Minnis v. Friend,* 360 Ill. 328,) the judgment of the Appellate Court is affirmed as to the defendant railway company, and the judgments of the circuit court and the judgment of the Appellate Court are reversed as to the defendant express agency.'' Appellate Court decisions followed the reasoning and decisions of the Supreme Court in these two cases in *DeMay v. Brew,* 317 Ill. App. 183, wherein it was held: ''Under par. (f) of sec. 92 of the Civil Practice Act, a court of review has power, on appeal from a judgment for damages against joint tortfeasors, to reverse the judgment as to one and affirm as to the other [citing *Crane v. Railway Express Agency, Inc., supra*]''; in *Nash v. Clark,* 310 Ill. App. 437, where *Minnis v. Friend* was expressly cited and approved, and wherein the court concluded that the judgment against one of the defendants was null and void but that the judgment as to the others was legal and valid. See also *Wuebbles v. Shea,* 294 Ill. App. 157. Defendants cite *Brown v. Zaubawky,* 388 Ill. 351, and *Skiras v. Magenis,* 324 Ill. App. 250, as supporting the old common-law rule. An analysis of these cases reveals that the issue in both instances involved the power and authority of a *trial* court to sever a judgment after vacating it. The power of a court of review, under section 92 (f) of the Civil Practice Act, was not in controversy.

It is conceded by defendants that *Minnis v. Friend* reversed the common-law rule that a unit judgment could not be reversed as to one joint tortfeasor but affirmed as to another, but they say that since *Crane v. Railway Express Agency, Inc., Minnis v. Friend* has been forgotten and ''has been given the silent treatment by the Supreme Court and is no longer accepted as the law of this state.'' Specifically they rely on *Fredrich v. Wolf,* 383 Ill. 638; *Gray v. First Nat. Bank of Chicago,* 388 Ill. 124, and *People v. Gentile Co-op. Ass'n,* 392 Ill. 393. In the *Fredrich* case a

unit judgment was entered against Wolf and Margaret Thiele. The power of attorney which authorized the confession was joint, and the court invoked the old common-law rule followed in *Claflin v. Dunne*, 129 Ill. 241, "that if a judgment entered as a unit against two or more defendants is so defective as to necessitate its vacation as to one defendant, it must be set aside as to all." In the *Fredrich* case plaintiff conceded the old common-law rule but invoked the provisions of section 50 of the Civil Practice Act [Ill. Rev. Stat. 1947, ch. 110, par. 174; Jones Ill. Stats. Ann. 104.050] as authorizing a procedure of severing a judgment as to two or more defendants. With respect to this contention the court merely held that there was nothing in that section of the Civil Practice Act that permitted the separation of a unit judgment *by the trial court* in the manner contended for by plaintiff; it did not hold that a court of appeal was powerless under proper circumstances to invoke the principle expressed in *Minnis v. Friend* and *Crane v. Railway Express Agency, Inc.*

In *Gray v. First Nat. Bank of Chicago* the judgment entered against William B. Gray, Ralph B. Gray and Ina Gray Cook, was joint and several. It was to recover under the Statute of Frauds the amount each had received under the mother's will. The court held that "under such circumstances, the part of the decree which determines the amount due cannot be reversed as to Ina Gray Cook and sustained as to the others, for this might have the effect of permitting a judgment to stand against them in excess of the amount allowed by statute. Each part of the relief purported to have been awarded against Ina Gray Cook *is so closely related to the relief granted against William B. Gray and Ralph B. Gray, that the decree cannot be reversed as to one without reversing as to all.*" (Italics ours.) It is true that the Supreme Court in the *Gray* case held that "where a decree is jointly binding on several defendants, so that each is

liable for the whole, a reversal on appeal as to one vacates the same as to all," and cited *Pittsburgh, Ft. W. & C. R. Co. v. Reno,* 123 Ill. 273, and *Tompkins v. Wiltberger,* 56 Ill. 385, both decided many years before the enactment of the Civil Practice Act, entirely disregarding the provisions of section 92 (f) of the Civil Practice Act and giving "the silent treatment," as counsel put it, to its earlier decisions in *Minnis v. Friend* and *Crane v. Railway Express Agency, Inc.;* but the reason given by the court for reversing the judgment as to all defendants clearly indicates that even under the authority of section 92 (f) of the Civil Practice Act, the court would not have been justified in reversing the judgment as to one defendant and affirming it as to the others.

In the remaining case, *People v. Gentile Co-op. Ass'n,* it was held that under the state of the pleadings the cause would have to be remanded because judgment was entered jointly against the separate defendants in the separate counts, and the court said "we are not authorized by the Civil Practice Act to sever the defendants in this court and enter a judgment against one or more. (*Fredrich v. Wolf,* 383 Ill. 638; *Gray v. First Nat. Bank,* 388 Ill. 124.)"

There is nothing in these cases which would justify the conclusion that the Supreme Court intended to depart from its earlier holding in *Minnis v. Friend* and *Crane v. Railway Express Agency, Inc.* If the Supreme Court intended in these decisions to change the established rule, it could have stated in unmistakable language its intention to do so. The provisions of section 92 (f) of the Practice Act are clear and explicit, and hold that the reviewing court may give any judgment and make any order which ought to have been given or made, and make such further and other orders, including "a partial reversal, . . . as the case may require." Defendants do not go so far as to urge that *Minnis v. Friend* and *Crane v. Railway*

*Express Agency, Inc.* were overruled; they simply suggest that because neither of these cases ·was cited in the later decisions, the Supreme Court had, so to speak, disregarded them. *Minnis v. Friend* is the leading case in this State on the question under consideration and has been followed except in cases where the rights of the codefendants were so interwoven as to be interdependent or unless the liability of the unsuccessful defendant necessarily or unavoidably depended upon the liability of the codefendant as to whom a new trial or reversal is granted.

It is conceded in the case at bar that the Reidelmaeiers were the owners of the property in question and proper defendants in the case; so, of course, was Muscarello a proper defendant inasmuch as he owned and operated the tavern. There is no valid reason why the judgment should not stand as to these three, even though Juric was not a proper party. Both the Reidelmaeiers and Muscarello had a fair trial as to the facts involving their liability, and there is no substantial reason why they should be given another trial. Accordingly, that portion of the judgment against the Reidelmaeiers and Muscarello is affirmed, and that against Juric is reversed.

*Judgment affirmed in part and reversed in part.*

SULLIVAN, P. J., and SCANLAN, J., concur.