(No. 34874.—

DONALD A. HOCKER *et al.,* Appellants, *vs.* MAX O'KLOCK, d/b/a WHITE MULE *et al.,* Appellees.

*Opinion filed March 20, 1959—Rehearing denied May 19, 1959.*

Schaefer, Klingbiel, and House, JJ., dissenting.

Robert H. White, of Geneseo, and Eagle & Eagle, of Rock Island, for appellants.

Frank G. Schubert, of Rock Island, for appellees.

Mr. Justice Bristow delivered the opinion of the court:

This court has allowed plaintiffs' petition for leave to appeal from a judgment of the Appellate Court, which set aside a jury verdict in the circuit court of Rock Island County awarding $20,000 as damages under the Liquor Control Act to plaintiffs, the wife and minor children of the

decedent, Donald Hocker, allegedly killed by an intoxicated person served alcoholic liquor by the defendant tavern owners.

The salient issue on this appeal is whether there is any evidence in the record in support of the essential allegation in the complaint that the decedent was killed by an intoxicated person served liquor by defendants. Other issues relate to the admissibility of evidence, and the propriety of particular instructions.

From the record it appears that Donald Hocker, age 31, and his family, consisting of a wife and three children, lived at Colona, Illinois, and that he supported them out of his earnings of approximately $80 per week as an employee of the John Deere Harvester plant. At about 1:00 P.M. on Saturday, February 23, 1952, Hocker entered the White Mule tavern, operated by the defendant Max O'Klock, and remained there all afternoon, playing euchre with some men and drinking beer. They drank a round of beer after each of many games. Around 2:00 P.M. a stranger, wearing a black leather motorcycle jacket and cap, who referred to himself as "Nichols," entered the tavern. "Nichols" spent the afternoon drinking, pacing between the card game and the bar, making a pest of himself with a woman sitting at the bar, exchanging smart remarks with Hocker, and otherwise acting edgy and fidgety.

Although "Nichols" and Hocker were not previously acquainted, by 7:00 P.M. they had become drinking companions, and left the White Mule together in an intoxicated condition. They drove off in "Nichols's" car, an old model black four-door Buick, with "Nichols" at the wheel and Hocker to his right, leaving Hocker's Ford station wagon behind, parked at the White Mule. They were next seen driving into Edward Hasty's service station, where the attendant refused their request to park in the driveway while they went into Van's Club, an adjoining tavern. They parked in the street, entered the club, operated by defend-

ant Rene Van Nevel, and began drinking more beer at the bar. Noting that they appeared "loaded," the barmaid asked the proprietor's wife to come out and see whether they should have anything more to drink. According to the wife's testimony, the men had beer bottles before them and were so intoxicated they could hardly stand up. Hocker even fell asleep at the bar. She ordered the barmaid not to serve any more liquor to them. After being refused more drinks, Hocker and "Nichols" left Van's Club together, some time between 8 and 9 P.M. That was the last time Hocker was seen alive.

It appears further that at 1:16 A.M., Sunday, February 24, 1952, officers Gene Gellerstedt and Keith Cordell of the Moline police force proceeded, pursuant to a report, to an address in Moline where they found a man asleep in the front seat of an old 4-door Buick sedan, with the motor running. The name on his identification card was E. R. Beasley, and from his condition it was apparent that he had been drinking heavily, and that he had vomited and urinated on himself. He did not appear frightened when awakened by the police officers, but explained that he had formerly lived at the address where he was parked, and wanted to sleep a while before driving home. The officers escorted him to a brightly lighted A & P parking lot, where they left him, after making a routine and cursory search of the car, which did not include the glove compartment.

At about 3:45 A.M. the witness Charles Pool, a Moline garageman, who was driving his wrecker north on 41st Street, saw the body of a man in a ditch on the right side of the road. The body was lying on its right side with the head, which was matted with blood, resting on the right arm in a pool of blood. There was a bullet hole behind the left ear, and one around the belt. Pool ran to a neighboring house to telephone the police, and they and the coroner arrived shortly thereafter. Detective sergeant Glenn L. Peterson recognized the body as that of Donald Hocker. Both

Peterson and Pool observed tire marks on the shoulder of the road close to the edge of the ditch and near the body. Pool identified the marks at the time as being made by Firestone tires. Although those present were told not to disturb the marks, there were no plaster casts made.

Examination of the body at the scene revealed that the blood had congealed on Hocker's head and on the ground, and that his body was cold and stiff, *rigor mortis* having set in. The body was taken to the mortuary between 4 and 5 A.M., where a pathologist performed an autopsy. Two .38-calibre bullets were recovered from the body, one having entered behind the left ear and lodged over the right eye, and the other having lodged in the abdomen.

In the opinion of coroner Leslie Banning, who saw the body of decedent while it was still lying in the ditch on the side of the road, Hocker had been dead between four or five hours. This opinion, admitted over defendants' objection, was based upon the coroner's $11\frac{1}{2}$ years of experience in his job, processing between 450 and 500 cases yearly, and upon the condition of the body, including the degree of *rigor mortis* as affected by the weather. The coroner's physician, testifying for defendants, stated that the onset of *rigor mortis* is affected by many conditions besides weather, and that the degree of *rigor mortis* is not too helpful in ascertaining the time of death. The pathologist, who performed the autopsy at approximately 5:00 A.M., testified that *rigor mortis* does not usually set in until 8 or 10 hours after death, but that exposure to cold would tend to decrease the time, consequently, in his opinion Hocker had then been dead anywhere from two to five or six hours.

Sergeant Peterson, who was in charge of the investigation of the death of Hocker, ascertained that Beasley, the man found drunk and asleep in the parked car at 1:16 A.M. Sunday, was the same person as the man known as "Nichols." At the trial, moreover, Beasley was identified as Nichols, Hocker's drinking companion with whom he drove

off, by persons who had been at the White Mule and at Van's Club that Saturday, and saw the men together. On March 14, 1952, approximately three weeks after Hocker was killed, Beasley was arrested at the trailer where he lived in London Mills, after Sergeant Peterson discovered a .38-calibre Spanish-make pistol concealed in the glove compartment of Beasley's 1939 model 4-door black Buick sedan, which had Firestone tires on its rear wheels and was parked in someone's garage. The gun was not loaded, and there was no evidence of blood stains in the car.

On the basis of substantially the foregoing evidence, the jury found that Beasley killed Hocker, and that defendants, who had served him liquor resulting in his intoxication, were guilty and liable for damages under the Liquor Control Act in the amount of $3,000 to Vivian I. Hocker, $6,500 to Donald A. Hocker, $7,500 to Donna Lynn Hocker, and $3,000 to Harry W. Hocker, for their loss of support as a result of Hocker's death. Defendants appealed from the judgment entered on the verdict, and the Appellate Court reversed the judgment and entered judgment for defendants notwithstanding the verdict, on the ground that there was no evidence in the record in support of the conclusion that Beasley killed Hocker.

The propriety of the Appellate Court's judgment for defendants notwithstanding the verdict presents the issue of whether or not there is *any* evidence in the record to support the jury verdict. This is a question of law (*Robinson v. Workman,* 9 Ill. 2d 420), and therefore, within our reviewing jurisdiction as provided in section 92(3)(b) of the Civil Practice Act. Ill. Rev. Stat. 1957, chap. 110, par. 92(3)(b).

In the instant case defendants' theory in the trial court was that plaintiffs need only establish that death of the decedent Hocker deprived them of their support, and that such death resulted from a direct affirmative act of Beasley, an intoxicated person to whom defendants had sold liquor.

The defendants squarely presented those issues of fact for the jury's determination by tendering and the court giving the following instruction:

"The court instructs the jury that in order for the plaintiffs to recover from the defendants in this case, they must prove by a preponderance of the evidence the following propositions: *First:* that Ernest R. Beasley shot and killed Donald Hocker; *Second:* that at the time of the shooting of the said Donald Hocker, Ernest R. Beasley was intoxicated; and *Third:* that the defendants sold or gave intoxicating liquor to the said Ernest Ralph Beasley which contributed to his intoxication, if any you find. If the plaintiffs failed to prove any one of the above propositions, then they cannot recover from the defendants or either of them."

With reference to the evidence supporting the essential elements of plaintiffs' claim, there is no question but that plaintiffs adduced evidence that Hocker and Beasley became intoxicated by liquor sold by defendants, and the plaintiffs were deprived of their support by Hocker's death. The only question is whether there was any evidence that Beasley was the person who killed Hocker. While there was no testimony by eyewitnesses to the killing, it is recognized that such fact may be established by circumstantial evidence. (*Wilkinson* v. *Aetna Life Ins. Co.,* 240 Ill. 205; *Robinson* v. *Workman,* 9 Ill. 2d 420, 428). In determining whether the circumstantial evidence establishes this essential fact, we do not require proof beyond a reasonable doubt, as in a criminal case (*Drezner* v. *Civil Service Com.,* 398 Ill. 219, 227); we require only, as in other civil cases, that the evidence and inferences therefrom, when viewed in the aspect most favorable to plaintiff, make it more probable that Beasley killed Hocker. (*Donoho* v. *O'Connell's, Inc.,* 13 Ill. 2d 113; *Lindroth* v. *Walgreen Co.,* 407 Ill. 121). As stated in the *Lindroth case:* "'The inquiry here is whether the result reached below was one which is reasonable on the facts in evidence, not whether other conclusions might also have

been reached. \* \* \* A verdict may not be set aside merely because the jury could have drawn different inferences or because judges feel that other conclusions than the one drawn would be more reasonable." This rule was followed in the dram shop case of *Zahn* v. *Muscarello,* 336 Ill. App. 188, where the court stated at p. 194: "Courts have always considered it within the province of the jury \* \* \* to make reasonable inferences from established facts, and such permissible inferences will not be discarded by a reviewing court because other inferences might have been drawn from such established facts, unless the inferences drawn are unreasonable. (*Rosenfield* v. *Industrial Com.,* 374 Ill. 176)."

We must, therefore, consider the circumstantial evidence respecting Beasley's connection with the Hocker killing in the light of this standard. It is uncontroverted that Hocker and Beasley were intoxicated when they left the White Mule after drinking all afternoon; that they had become drinking companions and rode off together in Beasley's old 4-door Buick sedan, leaving Hocker's station wagon at the White Mule, where it remained until after his body was found. It is also uncontroverted that they were seen together intoxicated and drinking in Van's Club; that they left the tavern together between 8 and 9 P.M., after being refused more drinks; that this was the last time Hocker was seen alive; that it was in Beasley's car that a .38-calibre Spanish-type revolver was found wedged between the back of the glove compartment and the ventilator cowl; and that Hocker was killed by two .38-calibre bullets.

While defendants question the probative value of this circumstantial evidence, it may be noted that it has been held proper to show that one accused of a crime had a revolver in his possession at the time he was arrested, even though it was over a month after the crime was committed, as tending to "aid in identifying the accused as the person who committed the particular crime under investigation."

*People* v. *McGuirk*, 312 Ill. 257, 264; *People* v. *Lenhardt*, 340 Ill. 538, 549; *People* v. *Cunningham*, 300 Ill. 376, 381.

There was also adduced the further circumstantial evidence that there were Firestone tire tracks, identified by a garageman at the time the body was discovered, on the shoulder of the road beside the ditch where Hocker's body lay, and that Beasley's car had two rear Firestone tires. While testimony that tire marks similar to those on an accused's car were observed at the scene of the crime by no means conclusively establishes his connection with the crime, it does constitute a link in the circumstantial chain by proving that a car with tires similar to those on the accused's car had been at the scene of the crime. 23 A.L.R. 2d 112, 149, 151; *Collier* v. *Commonwealth*, 303 Ky. 670, 198 S.W.2d 974.

To the foregoing uncontroverted circumstantial evidence must be added the further fact that when Hocker's body was discovered at 3 :45 A.M., the blood surrounding the bullet wounds had congealed, and *rigor mortis* had set in. The opinion of coroner Banning that Hocker had been dead between four and five hours when he saw the body was properly admitted and in no way constituted an abuse of the trial court's discretion, in view of the coroner's service and experience and the avowed basis for his opinion. (*People* v. *Spencer*, 264 Ill. 124; *Evanston Best & Co.* v. *Goodman*, 369 Ill. 207.) These circumstances tend to indicate that Hocker was killed several hours before Beasley was discovered sleeping off his drunk alone in his car. Even if the time of Hocker's death could not be established with precision, the circumstances in no way precluded the probability that Beasley killed Hocker, or made such a conclusion unreasonable.

Thus it is evident that the entire chain of circumstances constituted a reasonable basis for the jury's conclusion that Beasley killed Hocker. Such a conclusion or inference was clearly "more probable" than that Hocker was killed by

some imaginary stranger who also must have had a .38-calibre revolver and a car with Firestone tires, particularly since there was not a scintilla of contradictory evidence offered respecting the whereabouts of Beasley, or the likelihood of any third-party intervention.

Nor is this inference that Beasley killed Hocker in any way based upon other presumptions and inferences, in violation of the rules of evidence (*Globe Accident Ins. Co.* v. *Gerisch,* 163 Ill. 625), as defendants suggest. On the contrary, as we have shown, that inference was based upon proved relevant and uncontroverted facts and circumstances.

As hereinbefore noted, plaintiffs were not required to prove beyond a reasonable doubt that Beasley killed Hocker. It is a sufficient compliance with the requisite standards in civil cases if that conclusion is "more probable" and reasonable. *Drezner* v. *Civil Service Com.,* 398 Ill. 219; *Zahn* v. *Muscarello,* 336 Ill. App. 188; *Lindroth* v. *Walgreen Co.,* 407 Ill. 121.

In our judgment, therefore, plaintiffs' evidence and reasonable inferences therefrom amply support all the essential elements of their claim; hence, the Appellate Court erred in setting aside the jury's verdict and in entering judgment for defendants notwithstanding the verdict. The judgment of that court is therefore reversed, and the cause is remanded to the Appellate Court, with directions to consider other errors assigned.

*Reversed and remanded, with directions.*

SCHAEFER, KLINGBIEL, and HOUSE, JJ., dissenting:

We are of the opinion that upon the record in this case the judgment of the Appellate Court was correct and should be affirmed.